**MERCURY SERVICE, INC., and Mercury Refueling, Inc., Plaintiffs,**

v.

**ALLIED BANK OF TEXAS, Defendant.**

**No. CV 85–4503 WJR.**

United States District Court, C.D. California.

Aug. 14, 1987.

Lewis & Co., Santa Monica, Cal., for plaintiffs.

Jeffer, Mangels & Butler, Los Angeles, Cal., for defendant.

## MEMORANDUM DECISION AND ORDER SUSTAINING PERSONAL JURISDICTION AND AWARDING RULE 11 SANCTIONS

REA, District Judge.

The parties have presented four issues for the Court's decision: (1), whether plaintiffs have preliminarily demonstrated that the Court has personal jurisdiction over the defendant Allied Bank of Texas; (2), whether to transfer venue to a Texas district; (3), whether to sanction defendant or its counsel for the filing of a false or misleading declaration in support of their motion to dismiss for lack of personal jurisdiction; and (4), whether to impose discovery sanctions on Allied Bank in conjunction with plaintiffs' attempts to obtain records of the bank's California business.

### BACKGROUND

This action arises out of defendant Allied Bank's refusal to honor two checks written by Centurion Petroleum Company upon its Allied account to the plaintiffs Mercury Service, Inc. and Mercury Refueling, Inc. Centurion wrote the checks in question as payment for jet fuel sold by plaintiffs to Centurion in California.

Allied Bank was a creditor of Centurion, having funded a line of credit to Centurion that varied from $1 to $2 million. Pursuant to this line of credit, Allied took security interests in all of Centurion's corporate assets. Concerned about Centurion's doubtful solvency, Allied foreclosed on its line of credit in July 1984, and it seized Centurion's assets, including the corporation's checking account on deposit with Al-

lied—forcing Centurion into bankruptcy (Centurion has now ceased doing business). As a result, Allied refused payment on checks subsequently presented for payment on Centurion's account, including the checks at issue. Plaintiffs allege that defendant credited the balance of Centurion's checking account to Allied's own account despite knowing that Centurion had outstanding checks. Plaintiff filed suit in this Court on a number of theories, including a claim under 12 U.S.C. § 1972—which prohibits certain tying arrangements.

In December 1985, defendant Allied Bank of Texas filed a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). In support of this motion, defendant's counsel submitted the Declaration of Richard Eldred, Senior Vice President of the Corporate Services Department of Allied Bank. In this Declaration dated December 4, 1985, Mr. Eldred stated:

> Allied Bank of Texas is a Texas banking corporation with its principal offices in Houston, Texas. It is a "regional" banking institution which has a stated philosophy of doing business locally with people who have local credit references. Allied Bank of Texas has no offices in California. It has no employees in California. It has no agents or service of process in California and is not authorized, qualified or licensed to do business in California. It does not accept deposits or make loans in California. It owns no real property in California. It has no telephone listing in California. It solicits no business in California. No California banks maintain "correspondent" accounts with Allied Bank of Texas.

Mr. Eldred declared under the penalty of perjury that he had "personal knowledge" of these facts and if called as a witness, that he "could and would testify thereto."

The plaintiffs requested and the defendant eventually agreed to a continuance of the motion to dismiss to allow plaintiffs the opportunity to conduct discovery on the bank's contacts with California. The motion has been continued for over one year.

Discovery revealed that Mr. Eldred did not have personal knowledge of the statements in his Declaration. Plaintiffs deposed Mr. Eldred on November 17, 1986. In his deposition, Mr. Eldred indicated that he stated that Allied owns no real property in California on "[a]dvice of [in-house counsel, Charles Pickett] and understanding our nature of business." Eldred admitted that he had made no personal investigation and he was unaware what factual investigation Mr. Pickett had made.

Plaintiffs' counsel told Mr. Eldred that depositions of Allied's loan officers had revealed that the officers had gone to California in connection with loans made to California entities, and plaintiffs' counsel then asked whether Mr. Eldred was aware of these facts. Mr. Eldred indicated that he was not. This exchange followed:

> Q: Did you, at any time, advise Mr. Pickett or anyone else acting for or on behalf of Allied Bank, that you did not feel that you had the factual basis to comment on the loan practices or solicitation of loan business by Allied Bank?
>
> A. As I said earlier, I believe I did.
>
> Q. And, notwithstanding that, this document was prepared for your signature?
>
> A. Yes, sir.
>
> Q. All right.
>
> A. I hope that doesn't make me sound like a "blind fool," but when you have people indicate to you that they are dealing from a better position in Allied's [sic] than you, this is a pretty big institution to try to go searching around and try to figure out which each of dozens of loan officers have been doing for the last ten years.
>
> That was my understanding, and it was based on the philosophy of business that we have had ever since I have been with the company.

Mr. Eldred further stated in his deposition that he had no personal knowledge of several other facts stated in his Declaration and that in signing his Declaration he relied solely on the advice of in-house counsel that they were true. Mr. Eldred acknowledged that he did not know whether Centu-

rion Corporation was a Texas corporation currently in bankruptcy proceedings, did not know whether Centurion had a checking account with Allied, did not know whether Allied had dishonored checks drawn on Centurion's account, did not know whether an offered exhibit was in fact a true copy of the loan agreement between Centurion and Allied, and did not know whether an offered exhibit was a true and correct copy of the Trustee's Notice of Motion for Approval of Stipulation as to Property in Possession of Debtor mailed to Allied Bank of Texas on January 29, 1985.

Apart from the problem that Mr. Eldred falsely stated that he had personal knowledge to back the assertions in his Declaration, the assertions concerning the Bank's contacts with California are at least seriously misleading if not outrightly false. As the below discussion indicates, the true facts are that Allied Bank has numerous contacts with California that the Eldred Declaration omitted.

Mr. Eldred made statements in his deposition that contradicted his Declaration that the bank has a "stated philosophy of doing business locally with people who have local credit references." Mr. Eldred indicated that he and other Allied executives make occasional trips to California to encourage Customer Number One [1] to expand its business with the Bank. Eldred also calls Customer Number One in California "every couple months or so" to discuss business. Customer Number One employs Allied to act as a depository for escrow title insurance monies generated within Texas.

Allied Bank has additional contacts with California through its business with Centurion Petroleum Company. The activities of Centurion in California led to the generation of this lawsuit. Though Centurion was a Texas corporation, it has done substantial business in California. Allied Bank extended Centurion a line of credit varying from $1 million to $2 million to be used, in part, for the latter's activity in California. Four individuals domiciled in California guaranteed the letters of credit issued by the bank. The bank also took security interests in property that Centurion had in California.

Allied Bank has several other California contacts as follows:

Allied has an outstanding loan in excess of $30 million to a Texas company with a plant in Los Angeles, Customer Number Two. Part of the security for that loan includes an assignment on a lease on a Los Angeles plant with a value of $1.8 million, secured by a leasehold Deed of Trust.

Allied has maintained a $1 to 1.5 million loan to Customer Number Three, a corporation domiciled in Newport Beach, California. Allied accepted deeds of trust for California real property as security for the loan. Customer Number Three has also maintained certificates of deposits with Allied ranging from $300,000 to $400,000. An Allied loan officer visited Customer Number Three in Newport to discuss "if there were any further opportunities to loan the company money or generate further deposits."

A California resident guaranteed an Allied loan of $1,690,000 to Customer Number Four which used the funds to finance marine vessels used off California. An Allied loan officer visited California in connection with this loan. Another California resident guaranteed an Allied loan of about $6 million made in 1983 to Customer Number Five, which used the funds to purchase oil drilling tools used in various states, including California. Allied has a security interest in these tools.

A California resident has guaranteed Allied's loan to Customer Number Six, a company which operates in Louisiana.

Allied Bank has a $600,000 loan to Customer Number Seven, initially made in

---

1. The names of Allied's customers with California addresses have been redacted from this Memorandum Decision and Order to protect the privacy rights of such non-parties. Such information has been produced by Allied to plaintiffs pursuant to a Protective Order issued on September 5, 1986. The names of Allied's customers will be replaced herein with the designations "Customer Number One," "Customer Number Two," and so forth.

1982; the company apparently has a California parent that guaranteed the loan.

Allied Bank has made a $200,000 short term loan to a California company, Customer Number Eight. Allied loan officers flew to California for an overnight trip to negotiate this loan.

Allied has made a substantial loan to a California company, Customer Number Nine.

Allied also made loans of $317,000 and $259,000 to Customer Number Ten, a California company.

Allied Bank also accepted a deed of trust to property near Fresno, California from Customer Number Eleven, a California resident and the guarantor of a $250,000 loan to a Texas company, Customer Number Twelve.

After this lawsuit was filed, in July 1986, Allied also made a loan of $10 million to Customer Number Thirteen, an NBA basketball team.

## DISCUSSION

### I. PERSONAL JURISDICTION OVER ALLIED BANK

At the present stage of the proceedings, a Rule 12(b)(2) motion to dismiss, the Court has discretion to resolve the jurisdictional dispute by examining the adequacy of the plaintiffs' pleadings or, alternatively, by accepting and analyzing affidavits and discovery materials. The Court has done the latter. Accordingly, to prevail, the plaintiffs must offer affidavits which, if accurate, would establish personal jurisdiction. *Data Disc, Inc. v. Systems Tech Assoc., Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977). The Court finds that plaintiffs have met this burden. If defendant proves at trial that plaintiffs' affidavits are not true, then the possibility remains that the Court will ultimately find a lack of personal jurisdiction.

The basic standard for personal jurisdiction under the Fourteenth and Fifth Amendments' due process clauses is whether a defendant "has sufficient minimum contacts with the forum 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *see Olsen By Sheldon v. Government of Mexico,* 729 F.2d 641, 648 (9th Cir.1984). The *International Shoe* standard has been refined by subsequent cases, but the core of the test remains the same—a case by case determination of whether the defendant has been sufficiently involved with the forum such that it seems fair to allow him or her to be sued there. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528, 542 (1985).

Before personal jurisdiction may be exercised over a defendant, "'it is essential ... that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its law.'" *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183, 85 L.Ed.2d at 542, *quoting Hanson v. Denckla* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). If a defendant has continuously and systematically availed itself of the privilege of conducting activities within a forum, courts in the forum have "general jurisdiction." The defendant may be sued there on any cause of action, including those not arising out of forum-related transactions. *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 446–48, 72 S.Ct. 413, 418–19, 96 L.Ed. 485 (1952); *Olsen By Sheldon,* 729 F.2d at 648. If the defendant's forum contacts are less than "pervasive," courts in the forum only have "limited" or "specific jurisdiction." The defendant may only be sued in the forum on causes of action arising from forum-related transactions. *Data Disc,* 557 F.2d at 1287; *Olsen By Sheldon,* 729 F.2d at 649–51.

The distinction between general and limited jurisdiction, though a useful and employed analytical device, should not be misused to mask the ultimate inquiry in determining personal jurisdiction, which is whether the exercise of jurisdiction is fair and reasonable. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100

S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). The ultimate significance of the general and limited jurisdiction doctrines is that the more pervasively involved a defendant is with a forum, the less relationship a plaintiff's cause of action must have with the defendant's activity in the forum before a court has personal jurisdiction. Conversely, the more attenuated a defendant's involvement with a forum, the greater the relationship a plaintiff's cause of action must have with the defendant's activity in the forum.

Due process requires that courts respect the reasonable expectations of defendants about being haled into court in a given forum. *Id.* at 297, 100 S.Ct. at 567. A defendant does not reasonably foresee being sued in a distant forum simply because he or she may foresee causing injury there. *Id.* at 296–97, 100 S.Ct. at 566–67. Instead, purposeful availment of the privilege of conducting business in a forum is what creates a "reasonable anticipation" of being subject to suit in that forum. *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183, 85 L.Ed.2d at 542–43.

■ A defendant need not physically reside or travel to a forum before being held to have purposefully availed himself or herself of a forum's laws. The cases analyzing personal jurisdiction and due process recognize that, in modern commercial life, "a substantial amount of business is transacted solely by mail and wire communications across state lines...." *E.g., Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184, 85 L.Ed.2d at 543. Accordingly, the relationships a defendant has forged with the forum and its citizens are significant for personal jurisdiction and due process, not how he or she has done so. *Id.* 471 U.S. at 473, 105 S.Ct. at 2182, 85 L.Ed.2d at 541; *Travelers Health Assn. v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950); *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 222–23, 78 S.Ct. 199, 200–01, 2 L.Ed.2d 223 (1957).

Allied Bank has had continuous business contacts with California for several years, as recited above. While for the most part Allied Bank has not asserted a physical presence in California, this is not significant given that Allied has created substantial business relationships with California individuals and business entities. In forming these relationships, Allied has benefitted from the protection of California's laws. For example, should one of its borrowers default on a loan guaranteed by a California citizen or secured by California realty or personalty, the laws and the courts of the state would provide remedies to Allied.

■ The Court need not decide whether Allied Bank of Texas can be sued in California on any and all claims. Instead, the Court only need decide whether the bank can be sued by plaintiffs on the present claims. Significantly, Allied Bank's relationship with Centurion, a corporation which Allied knew to have substantial California business, generated this lawsuit. When Allied closed Centurion's checking account and transferred the funds to its own account, Allied had at least some reason to anticipate that California citizens would be left holding checks that the bank would subsequently refuse payment upon. Accordingly, the Court finds that Allied Bank has had sufficient minimum contacts with California such that it is fair and reasonable for this Court to exercise jurisdiction over the bank for purposes of this lawsuit.

## II. TRANSFER OF VENUE

As an alternative to dismissing the action, Allied has requested the Court to transfer venue to a district in Texas. Pursuant to 28 U.S.C. sections 1404 or 1406, the Court may transfer this action "for the convenience of parties and witnesses, in the interest of justice ... to any other district where it might have been brought." Section 1404 allows transfers by a court that has jurisdiction and venue. Section 1406 allows transfers by a court that lacks jurisdiction or venue. *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962); *Bentz v. Recile,* 778 F.2d 1026 (5th Cir.1985).

*A. Whether the Central District of California is a Permissible Venue*

The first step for the Court is to determine whether venue in the Central District of California is permissible in this action. If it is not, the Court must either dismiss or transfer this action.

This action is brought in federal court pursuant to a federal question presented under 12 U.S.C. section 1972 *et seq.* and diversity of citizenship. Accordingly, the relevant venue statute governing this action is 12 U.S.C. section 1975, which provides that venue is proper "in any district ... in which the defendant resides or is found or has an agent." [2] Applying this provision, the Court must determine where the defendant Allied Bank resides for venue purposes. Under 28 U.S.C. section 1391(c), a corporation resides "in any judicial district in which it is incorporated or licensed to do business or is doing business." Allied Bank is not incorporated or licensed in California, and thus the important issue in this action is whether the bank is "doing business" in California.

Interpreting the "doing business" phrase in 28 U.S.C. section 1391(c), many courts have held that if a corporation has sufficient business contacts with a forum to be subject to personal jurisdiction there, then venue is also proper in that district. *E.g., Du-Al Corp. v. Rudolph Beaver, Inc.,* 540 F.2d 1230 (4th Cir.1976); *Fraley v. Chesapeake & O.R. Co.,* 397 F.2d 1 (3d Cir.1968); *Houston Fearless Corp. v. Teter,* 318 F.2d 822 (10th Cir.1963); *Oral-B Laboratories, Inc. v. Mi-Lor Corp.,* 611 F.Supp. 460, 462 (S.D.N.Y.1985). Other courts, however, have held that a corporation must be doing more business within a district than would be sufficient to subject the corporation to personal jurisdiction within the forum. *E.g., Johnson Creative Arts v. Wool Masters,* 743 F.2d 947, 951–52 (1st Cir.1984). The Ninth Circuit Court of Appeals has not ruled on this issue, thus requiring this Court to decide which approach is more persuasive.

Some authorities have rejected that the venue test of "doing business" should be the same as the test for personal jurisdiction because "the considerations underlying personal jurisdiction are not the same as those underlying venue." *Johnson Creative Arts,* 743 F.2d at 949. While it is true that the considerations underlying personal jurisdiction and venue are not identical, there is some considerable overlap. Personal jurisdiction restrictions exist for two reasons: to protect defendants from the burden and potential unfairness of litigating in distant forums and to ensure that the States, through their courts, do not infringe upon the sovereign prerogatives of other States within our federal system. *See World-Wide Volkswagen Corp.,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490. Venue limitations exist to ensure a defendant a fair location for trial. *Leroy v. Great Western United Corp.,* 443 U.S. 173 (1979). Thus, as Wright, Miller & Cooper observe, "both doctrines are intended to protect against an inconvenient forum, while the minimum contacts rule [governing personal jurisdiction] also has a federalism component." 15 Wright, Miller & Cooper, Federal Practice & Procedure § 3811, at 121 (2d ed. 1986). As both personal jurisdiction and venue doctrines are designed, at least in part, to preserve fairness in choice of forum, there is no compelling reason why the standard for "doing business" should differ for jurisdictional and venue purposes. Instead, "there is a great advantage in having one standard of 'doing business' for both doctrines rather than complicating an already-complicated matter by having two different standards." Wright, Miller & Cooper § 3811, at 121.

■■■ The Court finds that the test of whether a defendant corporation is "doing business" within a district so as to make that district a proper venue should be the same as whether a corporation has transacted sufficient business within a forum

**2.** The venue provision applicable to diversity of citizenship actions, which varies from the venue rule of 12 U.S.C. section 1975, is not applicable in an action based on both diversity of citizenship and a federal question. 28 U.S.C. § 1391(b). Furthermore, the general federal question venue rule of 28 U.S.C. § 1391(b) does not apply when it is superseded by a federal venue statute applicable to the specific claim at issue. Accordingly, venue is to be determined solely by 12 U.S.C. section 1975.

state so as to be subject to personal jurisdiction there. In other words, whenever a corporation is amenable to personal jurisdiction in California, then venue is also proper in one of the four federal judicial districts in California. The parties have not addressed whether venue best lies in the Central District rather than one of California's other federal districts. On the record presently before the Court, though, the Central District seems to be a better venue than the other federal districts in California. Many of Allied Bank's contacts with California have occurred within this district and the plaintiffs' principal place of business is here. Accordingly, the Court finds that plaintiffs have presented a prima facie case that the Central District is a permissible venue.

B. *Whether the Central District is a Convenient Venue*

 Even if the Central District of California is a permissible venue, this Court could transfer this action to Texas in the interests of justice and for the convenience of the parties. 28 U.S.C. § 1404. The parties dispute whether a California or Texas forum will be more convenient to the parties and witnesses. Comparatively, plaintiffs would suffer a somewhat greater inconvenience if they are required to try their case in Texas than defendants would suffer if they are required to defend this case in California. The record before the Court indicates that the defendant has come to California for business, but the plaintiffs have not traveled to Texas for business. As far as witnesses are concerned, defendant has indicated that one important witness, the former Allied Bank loan officer who supervised the bank's relationship with Centurion, resides in Texas. Defendant has indicated that it may be difficult to get this individual to testify in California, as he has demonstrated an unwillingness to come here and he is beyond the subpoena power of this Court as provided for in Federal Rule of Civil Procedure 45. An additional important witness resides in Texas, Centurion's former Senior Vice President, Wayne Lovett. Mr. Lovett signed the checks at issue in this case and has personal knowledge of the details of Allied's and Centurion's relationship. Mr. Lovett, however, has indicated a willingness and indeed, a preference, to testify in California. Plaintiffs expect to call an additional former employee of Centurion, Beth Carey Wiltze, who lives in San Diego, California. Plaintiffs further expect to call three former Allied employees who reside in New York, Connecticut, and South Carolina, respectively. Thus, a California forum would be more convenient to at least two witnesses and a Texas forum more convenient to one witness. The remaining three witnesses would probably be essentially indifferent to the choice of forum.

The evidence to be presented in this case apart from the oral testimony of witnesses will consist of the records of Allied Bank, Centurion, and, to a lesser extent, the plaintiffs, Mercury Service, Inc. and Mercury Refueling, Inc. While many of the relevant documents are presently located in Texas, some are in California. The physical location of these documents is not very significant, however, as moving them to this Court will not seriously burden the parties. Overall, a California forum is probably slightly more convenient than a Texas forum, and thus this Court will not disturb the plaintiff's choice of forum.

## III. SANCTIONS FOR THE FILING OF ELDRED'S DECLARATION

Pursuant to Federal Rule of Civil Procedure 11, plaintiffs request sanctions of $74,915.39 against the defendant and its counsel for their filing of the Eldred Declaration. They claim this sum represents the fees for the discovery they would have avoided had Mr. Eldred and the bank been initially candid.

A. *Rule 11 Sanctions*

Rule 11 requires parties or attorneys to file pleadings, motions and other papers that are "well grounded in fact and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and ... not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litiga-

tion." If a party or his counsel files a paper in violation of this Rule, the Rule further provides that "the court ... shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party ... the reasonable expenses incurred because of the filing of the ... paper, including a reasonable attorney's fee."

■ Under Rule 11, sanctions are appropriate if, measured objectively, a motion or paper is frivolous, legally unreasonable, or without factual foundation. *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 831 (9th Cir.1986). Subjective good faith is not a defense to a Rule 11 motion. *Id.* at 829 (quoting with approval Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 187 (1985): "There is no room for a pure heart, empty head defense under Rule 11.") Instead, the rule creates a new "affirmative duty of investigation both as to law and as to fact before motions are filed." *Golden Eagle Distributing Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1536 (9th Cir.1986).

■ A district court has a mandatory duty to impose sanctions for a violation of Rule 11, though the court has discretion on the appropriate amount or nature of the sanction. *Golden Eagle Distributing Corp. v. Burroughs Corp.,* 801 F.2d at 1538; *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 n. 7 (2d Cir. 1985) ("Unlike the statutory provisions that vest the district court with 'discretion' to award fees, Rule 11 is clearly phrased as a directive. Accordingly, where strictures of the rule have been transgressed it is incumbent upon the district court to fashion proper sanctions.").

■ A basic purpose of Rule 11, as the Ninth Circuit and the Advisory Committee which drafted the Rule have observed, is to " 'reduce frivolous claims, defenses or motions' and to deter 'costly meritless maneuvers,' ... [thereby] avoid[ing] delay and unnecessary expense in litigation." *Golden Eagle Distributing Corp.,* 801 F.2d at 1536; Advisory Committee Note, 97 F.R.D. 165, 192 (1983). While expediting litigation is a basic purpose of Rule 11, it is not the sole purpose. In appropriate circumstances, a district court may impose a punitive sanction for the filing of a paper that lacks factual foundation and is intended to mislead the Court and opposing parties, even if the paper does not significantly delay proceedings, because of the disrespect shown to judicial process.

Defendant argues that a court may not award sanctions for a merely punitive purpose, but is limited to imposing a sanction that will compensate the opposing party for the harm inflicted by conduct that violates Rule 11. Defendant cites *In re Itel Securities Litigation,* 596 F.Supp. 226, 234 (N.D. Cal.1984) which states:

Rule 11 contemplate[s] reimbursement for the expenses necessarily incurred because of the misconduct. [It] do[es] not contemplate an award of punitive sanctions. In other words, in making an award pursuant to ... Rule 11, the Court can only award fees and sanctions for expenses incurred in responsive or defensive actions.

Defendant further relies on a Ninth Circuit Court of Appeals decision, *In re Matter of Yagman,* 796 F.2d 1165 (9th Cir.), *amended on other grounds,* 803 F.2d 1085 (9th Cir.1986). Defendant's reliance on *In re Yagman* is misplaced, however. In that case, the Ninth Circuit only held that *"When the sanctions award is based upon attorney's fees and related expenses, ... [r]ecovery should never exceed those expenses and fees that were reasonably necessary to resist the offending action."* 796 F.2d at 1184–85 (emphasis added). In making this observation, the Ninth Circuit implied an assumption that sanctions under Rule 11 other than an award of the attorney's fees generated in opposing a frivolous action or motion may be appropriate. This is the logical reading of Rule 11, which states that a court may impose "an appropriate sanction, *which may include* ... the reasonable expenses incurred because of the filing of the ... paper, *including* a reasonable attorney's fee" (emphasis added). The implication is that an award of

attorney's fees is one, but not the only sanction that a court may impose.

Defendant's counsel attempted to mislead the Court into finding that *In re Yagman* holds broadly "recovery should never exceed those expenses and fees that were reasonably necessary to resist the offending action." Counsel further declined to cite the substantial authority running contrary to *In re Itel.* While this itself is not sanctionable conduct, *Golden Eagle Distributing Corp.,* 801 F.2d at 1541–42, it is not conduct appreciated by the district courts.

There is substantial authority within the Ninth Circuit holding that Rule 11 *does* contemplate an award of punitive sanctions. This is the position of a district court judge in the Northern District of California, Judge Schwarzer. Schwarzer, *Sanctions Under the New Rule 11—A Closer Look,* 104 F.R.D. 181, 185 (1985); *Kendrick v. Zanides,* 609 F.Supp. 1162, 1173 (D.C.Cal.1985); *Huettig & Schromm v. Landscape Contractors Council,* 582 F.Supp. 1519 (N.D.Cal.1984), *aff'd* 790 F.2d 1421 (9th Cir.1986); *Heimbaugh v. City & County of San Francisco,* 591 F.Supp. 1573 (N.D.Cal.1984). The approach to Rule 11 outlined by Judge Schwarzer in his Federal Rules Decisions article has been generally held persuasive by the Ninth Circuit. *See In re Yagman,* 796 F.2d at 1182–85 (not discussing whether Rule 11 sanctions are punitive in nature, but generally approving Judge Schwarzer's article). Furthermore, one scholar has observed that Judge Schwarzer's punitive approach to Rule 11 "is at least partially consistent with the ... advisory committee's notes ...: 'The words "sanctions" in the caption, for example, stresses a deterrent orientation in dealing with improper pleadings, motions, or other papers.'" Nelken, *Sanctions under Amended Federal Rule 11— Some "Chilling" Problems in the Struggle between Compensation and Punishment,* 74 Georgetown L.J. 1313, 1324 (1986).

Judge Schwarzer's punishment view has support from several reported decisions in which district courts have imposed Rule 11 sanctions facially designed more to punish the transgressor than to compensate the opposing party for wasted effort and associated costs and attorney's fees. Such sanctions have included paying money into court, *Barton v. Williams,* 38 Fed.R. Serv.2d 966 (N.D.Ohio 1983), *Dore v. Schultz,* 582 F.Supp. 154 (S.D.N.Y.1984); dismissal, *Valle v. Taylor,* 587 F.Supp. 514 (D.N.D.1984); deeming certain allegations of the complaint admitted, *Johnson v. Department of Health,* 587 F.Supp. 1117 (D.D.C.1984); and placing a reprimand in the court's file on attorneys admitted to its bar, *Allen v. Faragasso,* 585 F.Supp. 1114 (N.D.Cal.1984) (by Schwarzer, J.).

Further support for a punitive view of Rule 11 can be found in *Golden Eagle Distributing Corp.* In that case, the Ninth Circuit reversed a district court's imposition of sanctions upon counsel who had argued a motion without revealing controlling adverse authority. A key fact in this outcome was the district court's overlooking whether the attorney knowingly misrepresented the law. The Ninth Circuit held that "an earnest advocate exaggerating the state of the current law" should not be sanctioned under Rule 11. 801 F.2d at 1540. The Court implied, however, that sanctions against "the unscrupulous lawyer knowingly deceiving the court" are appropriate. *Id.*

B. *The Court's Inherent Power to Sanction Bad Faith Conduct*

In addition to their authority under Rule 11, the federal courts have authority to impose sanctions under their "inherent powers" "which are necessary to the exercise of all others." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980); *In re Yagman,* 803 F.2d 1085. *Roadway Express* and Ninth Circuit authority provide that a court may sanction "bad faith conduct under the court's inherent power, if [that is] found to be appropriate." *In re Yagman,* 803 F.2d at 1085; *see Roadway Express,* 447 U.S. at 766, 100 S.Ct. at 2464. *Id.* at 765, 100 S.Ct. at 2463. The Court observed that these inherent powers include but are not limited to the contempt sanction,

"which a judge must have and exercise ... in maintaining the authority and dignity of the court." *Id.* at 764, 100 S.Ct. at 2463. Sanctioning a party or its counsel for the filing of false or seriously misleading affidavits is appropriate under these inherent powers, whether the Court makes a specific contempt finding or not, to maintain the authority and dignity of the Court.

### C. *Sanctions Upon Allied Bank and Its Counsel Are Appropriate*

In arguing that the Eldred Declaration is not sanctionable under Rule 11, counsel for Allied Bank boldly states, "There is no false statement in the Eldred Declaration." Counsel is well aware, however, that, at a minimum, Mr. Eldred made one false statement in his Declaration—that he had personal knowledge of all the matters stated therein. In truth, he lacked personal knowledge of virtually every assertion in the Declaration.

Defendant's counsel tries to convince the Court that Mr. Eldred's near total lack of knowledge on the matters in his Declaration is unimportant by observing, "To the extent the statements in the Eldred Declaration were not based on his personal knowledge, they were based on the personal knowledge of others, such as in-house counsel, and the statements are accurate."

Even assuming that all statements are true in the Eldred Declaration except Eldred's statement that he had personal knowledge of the matters stated, Rule 11 sanctions seem appropriate, though a smaller sanction would be in order than if some of the other statements are false, too. Rule 11 and the cases under it state that a court *shall* impose sanctions for filing a paper which is "without factual foundation." *Zaldivar*, 780 F.2d at 831. This Declaration at least partially lacked factual foundation. It was clearly unethical for in-house counsel Charles Pickett to advise Mr. Eldred to sign the Declaration, and it was further unethical for the local attorneys appearing in this action to offer the Declaration in support of their Motion to Dismiss. In addition to being unethical, the filing of the Declaration put the plaintiffs to some unnecessary work. At a minimum, Mr. Eldred's Declaration misled the plaintiffs into believing that Mr. Eldred was the person within Allied Bank who should be deposed to discover the facts concerning the bank's contacts with California. Thus, the Declaration had the tendency to steer the defendants away from deposing the personnel who actually had the relevant knowledge. Furthermore, in preparing this Declaration, defendants attempted to avoid the added effort of discovering who within Allied had personal knowledge of the relevant facts and preparing their (perhaps several) Declarations—leaving plaintiffs to ferret out who within the corporation had the relevant knowledge. Also, the Declaration had the effect of leading the Court and the plaintiffs to falsely believe that a high officer within Allied with an overview of the bank's operations personally knew that Allied had no contacts with California, and the plaintiffs had to expend effort to disprove this.

In addition to the false representation of Eldred's personal knowledge, however, the Declaration contains other misleading if not outrightly false statements. In his Declaration, Mr. Eldred stated that the bank has a philosophy of doing business locally with people who have local credit references. He added that the bank does not accept deposits or make loans in California and owns no real property here. These statements in their context imply that the bank has no contacts with California whatsoever. This is misleading. While the bank might not physically accept deposits or make loans in California, the bank has substantial loans to California businesses, has guarantees on large loans from California citizens, and has a profitable depository relationship with Customer Number One, a California business. While the bank might not currently have fee simple title to real property in California, it has security interests in California real and personal property and *will* obtain fee simple title to California real property should parties default on certain loans. As for the bank's "philosophy" of doing only regional business, bank officers have made trips to California to service existing business rela-

tionships with California citizens and to encourage them to expand their business.

■ Pursuant to Rule 11 and its inherent powers, the Court finds that sanctions are appropriate both because the statement that Eldred had personal knowledge is false and because the representations about the bank's California contacts are misleading. The Declaration is a paper filed without factual foundation that led to otherwise unnecessary inquiries and arguments by the plaintiffs. Furthermore, its filing warrants punishment to deter similar conduct that demonstrates disrespect for the dignity and authority of the courts.

■ Rule 11 allows a court to sanction an attorney, his or her client, or both. In this case, Mr. Eldred appears to be culpable because he signed the offending Declaration. Yet, plaintiffs themselves have requested that the Court not impose a sanction on Mr. Eldred due to his deposition candor. The Court accepts plaintiffs' position and will only admonish Mr. Eldred not to declare under the penalty of perjury that he has personal knowledge of matters of which he is ignorant.

■ The in-house counsel who advised Mr. Eldred to sign the Declaration appears to be a serious transgressor in the incident. The Court would sanction him if it had jurisdiction over him. He has not appeared in this action to represent the Bank, nor is he a party, and thus the Court lacks jurisdiction over him. Under the circumstances, the Court sanctions Allied Bank instead. The Court clearly has jurisdiction over the Bank as a party in this action. Moreover, the Bank is properly liable for the actions of its agents in pursuing this litigation. A sanction of $1,500 is appropriate as a fair reminder to an institution of Allied Bank's size that it must demonstrate proper respect for judicial process.

■ The Court further sanctions local counsel. Local counsel *clearly* knew after Mr. Eldred's deposition that he lacked personal knowledge of the matters stated in his Declaration. Counsel further knew that the Declaration is misleading if not outrightly false as to its assertions about

the Bank's contacts with California. Nevertheless, they offered the Declaration as support for a renewed Motion to Dismiss. A sanction of $500 on each of the three attorneys whose names appear on the papers submitted to this Court is appropriate.

## IV. PLAINTIFFS' REQUEST FOR DISCOVERY SANCTIONS

■ Plaintiffs request discovery sanctions for defendant's alleged violation of a discovery order entered by Magistrate Tassopulos.

Magistrate Tassopulos ordered defendant to produce, amongst other things, a customer list. Plaintiffs desired to scrutinize the list for evidence of California contacts. Allied produced the customer list in the form of microfiche which took the plaintiffs, according to their counsel, thirty-six hours to review. They claim that Allied could have supplied the same information in twenty to thirty minutes by use of computer, where the information was readily available. Plaintiffs seek sanctions for defendant's having put them to needless work in violation of the spirit of the Magistrate's order.

Defendant responds that the information was not readily available on computer, and the Bank thus did not put the plaintiffs to needless work.

Sorting out whose version of events is accurate would require the equivalent of an evidentiary hearing and thus unduly drain the Court's resources. Accordingly, the Court refers the matter to Magistrate Tassopulos pursuant to Federal Rule of Civil Procedure 72.

## ORDER

On the matter of Defendant's Motion to Dismiss for Lack of Personal Jurisdiction, or, Alternatively, To Transfer Venue now before this Court, and Plaintiffs' Motions for sanctions, the Court having considered the papers filed in support thereof and in opposition thereto and having heard oral argument,

IT IS HEREBY ORDERED that:

the Motion to Dismiss for Lack of Personal Jurisdiction is DENIED,

the Motion to Transfer Venue is DENIED,

the Motion for Rule 11 Sanctions is GRANTED and Defendant Allied Bank of Texas is ordered to pay plaintiffs $1500,

the counsel for Allied Bank of Texas whose names appear on defendant's Memorandum of Points and Authorities in Support of Motion (1) To Dismiss Complaint for Lack of Personal Jurisdiction; And (2) Conditionally, for an Order Transferring Venue are ordered to pay $500 each, for a total of $1500, to plaintiffs,

the Motion for Discovery Sanctions is referred to Magistrate Tassopulos.