**LUCASARTS ENTERTAINMENT COMPANY, a California corporation, Plaintiff,**

v.

**HUMONGOUS ENTERTAINMENT COMPANY, a Washington corporation, Defendant,**

**Electronic Arts, Inc., Intervenor–Defendant,**

**and Related Counterclaims.**

**No. C–92–4410–VRW.**

United States District Court, N.D. California.

March 3, 1993.

William S. Coats, David M. Shannon, Heather D. Rafter, Gibson, Dunn & Crutcher, San Francisco, CA, James M. Kennedy, San Rafael, CA, for plaintiff LucasArts Entertainment Co.

David M. Furbush, Amy J. Winn, Brobeck, Phleger & Harrison, Palo Alto, CA, for defendant Humongous Entertainment Co.

David W. Slaby, Mark S. Ostrau, Fenwick & West, Palo Alto, CA, Ruth A. Kennedy, Electronic Arts, Inc., San Mateo, CA, for intervenor-defendant Electronic Arts, Inc.

### ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION.

WALKER, District Judge.

This suit arises as a result of an agreement between Electronic Arts, Inc. ("Electronic Arts") and defendant Humongous Entertainment Company ("Humongous"), granting Electronic Arts the right to distribute Humongous' products, including a computer video game entitled *Putt Putt Joins the Parade*. Humongous' principals are former employees of plaintiff LucasArts Entertainment Company ("LucasArts") who created a software tool

called the Script Creation Utility for Maniac Mansion ("SCUMM") System. The SCUMM System is a tool used in the development of computer video games. LucasArts subsequently licensed the SCUMM System to Humongous under limited terms and conditions. Among other things, the license agreement states that Humongous may not sell its games which utilize the SCUMM program to any third party distributor other than LucasArts for less than a certain price and that Humongous must verify its compliance with the licensing agreement at LucasArts' request. The precise language as outlined in § A.1.1.1(b) of the license agreement is as follows:

> For a period of three (3) years commencing on the Effective Date, [Humongous] may not sell any product it develops using the SCUMM System to any third party distributors in North America other than [LucasArts] for less than seventy-five percent (75%) of the six month rolling average wholesale price, net of any promotional allowances, at which such products are resold to North American retailers (current examples of which include Software, Etc.; Babbages; and Electronic Boutique). [LucasArts] reserves the right to verify such wholesale price upon [LucasArts'] request in writing to Licensee. After such three year period, the foregoing price restriction will be inapplicable.

LucasArts brings this suit alleging, among other things, that Humongous violated the terms of the licensing agreement by (1) failing to follow the terms of the price restriction provision and (2) allowing a third party (*i.e.,* Electronic Arts) to publish *Putt Putt Joins the Parade.*

LucasArts moves the court to grant a preliminary injunction against Humongous pursuant to FRCP 65. Having reviewed the papers submitted and considered the oral arguments of counsel at a hearing on February 26, 1993, the court hereby DENIES LucasArts' motion for preliminary injunction.

## I.

LucasArts is entitled to a preliminary injunction against Humongous if it can show either: (1) probable success on the merits and the possibility of irreparable injury or (2) serious questions going to the merits and a balance of hardships tipping in its favor. *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378 (9th Cir.1987); *Regents of Univ. of California v. A.B.C., Inc.,* 747 F.2d 511, 515 (9th Cir.1984). LucasArts fails under both tests.

## II.

LucasArts' argument for likelihood of success on the merits is rather long and tenuous. To make its copyright infringement claim, LucasArts attempts to jump through several legal hoops: first, Humongous has breached the licensing agreement; second, Humongous' breach is so extreme as to constitute a material failure of consideration; third, the failure of consideration entitles LucasArts to rescind the license agreement; fourth, once rescinded, Humongous' continued use of the copyrighted SCUMM program constitutes infringement; fifth, if there is copyright infringement then irreparable harm is presumed and the preliminary injunction should be granted. In this case, LucasArts is unable to clear all the hoops successfully.

## A.

LucasArts claims that Humongous has breached at least three material aspects of its licensing agreement with LucasArts. First, pursuant to § A.1.1.1(b) of the agreement, Humongous had an obligation to sell its games developed with the SCUMM System to third party distributors at no less than

> seventy-five percent (75%) of the six month rolling average wholesale price, net of any promotional allowances, at which such products are re-sold to North American retailers * * *.

Instead, Humongous entered into a separate contract with Electronic Arts to sell SCUMM-based games at twenty-five percent (25%) of retail price. *See* § 5.01 of the Electronic Arts Manufacturing and Distribution Agreement. Thus, LucasArts maintains that at the moment Humongous entered into an agreement with Electronic Arts providing for

pricing of its product at less than seventy-five percent of the average wholesale price, Humongous materially breached its obligation to LucasArts under the licensing agreement.

Second, LucasArts contends that Humongous breached its contractual obligation to make available to LucasArts documentation that would verify Humongous' compliance with the pricing regime to which it had agreed. According to LucasArts, Humongous consistently refused access to, and denied inspection of, its invoices and other documentation containing wholesale pricing information.

Third, LucasArts maintains that § A.1.1.1(b) of the license agreement only permitted Humongous to publish SCUMM-based games and that Humongous breached this obligation by serving as a contract games developer for other publishers, such as Electronic Arts.

Humongous does not really dispute the fact that it failed to make its documents available to LucasArts for inspection, nor does it dispute that it sold SCUMM-based software for 25% rather than 75% of the wholesale or retail price. Humongous does, however, dispute the meaning of the price restriction clause in § A.1.1.1(b) of the licensing agreement.

■ Humongous argues that § A.1.1.1(b) was never intended to define "publisher," nor to prohibit Humongous from selling any SCUMM-based products to third party publishers. LucasArts contends otherwise. According to LucasArts, through the pricing formula articulated in § A.1.1.1(b), the parties agreed to define Humongous' permitted position in the marketplace relative to that of an independent publisher. Since a publisher typically receives at least 75% of the average wholesale market price, the 75% wholesale price floor set forth in § A.1.1.1(b) would limit Humongous' market role to that of an independent developer and publisher of SCUMM-based games. In other words, it would ensure that Humongous would never

serve as a developer for a third-party publisher, since the 75% floor is far out of the range of royalties publishers normally pay developers. Publishers typically pay royalties to developers in the range of 10% to 20% of the price at which they sell games to distributors. *See* Flock Declaration, ¶ 4.

The court disagrees with LucasArts' interpretation. Section A.1.1.1(b) seems a convoluted way to define the term "publisher" in a license agreement if that truly is the objective of the provision. Moreover, even if § A.1.1.1(b) defines "publisher," Humongous did not breach its obligation by entering into the agreement with Electronic Arts because Humongous, not Electronic Arts, was the publisher of SCUMM-based games.

There is no consensus that any single criterion defines a publisher. Those indicia most often cited by individuals within the entertainment software publishing and distribution industry include artistic control of the content of the game, the brand name under which a game is sold, the control over the design of the printing on the box, the identity of ownership and the manner in which the public perceives the games. *See* Ruth Kennedy's Declaration in Opposition to Motion for Preliminary Injunction.

■ Between Humongous and Electronic Arts, Humongous clearly has greater artistic control. The product's box carries Humongous' brand name prominently displayed on the front and the spine of the box, as is traditional for publishers.[1] Electronic Arts is only mentioned by a "Distributed by [Electronic Arts]" sticker applied to the plastic wrap for the packaging. Humongous controls the manner of marketing the games, and the public perceives the games as Humongous games. While it is true that any product produced by Humongous is subject to the approval of Electronic Arts, section 1.01 of the agreement between Humongous and Electronic Arts states that "[s]uch acceptance will not be unreasonably held."

[1]. The fact that the Price Club erroneously labelled *Putt Putt Joins the Parade* as published by Electronic Arts does not reflect the understanding between Humongous and Electronic Arts that

Humongous is the publisher. *See* Declaration of William Coats in Support of Motion for Preliminary Injunction.

In addition, Electronic Arts has only fifteen business days to examine and test the product and to determine whether it conforms to the product's specifications. The fact that Electronic Arts has only fifteen days to inspect the product and the fact that it can reject it only for lack of conformance with product specifications suggests that Electronic Arts' role in determining the artistic content of the games is extremely limited.

The intent of Humongous and Electronic Arts to establish Humongous as the publisher is clearly indicated in section 7.01 of their agreement. It states:

> Humongous represents to [Electronic Arts] that it is capable of and intends to be the product publisher of the Initial Products and that Humongous is solely responsible for all obligations attendant upon such a role, including without limitation, Initial Product design and testing, package design, advertising and marketing Initial Products, dissemination of Initial Product information and prompt revision, updates and retrofits to all of the foregoing in the event of changes or developments in the market for the Initial Products.

This would appear ample evidence of Humongous' artistic control for the court to determine Humongous' status as publisher and Electronic Arts' role as distributor of the SCUMM-based games.

### B.

Next, LucasArts argues that the breaches amount to a material failure of consideration. According to LucasArts, Humongous' agreement to publish its own games and not to develop SCUMM-based games for a competitor, such as Electronic Arts, provided the essential consideration to LucasArts in the licensing agreement. As LucasArts stated in its brief,

> LucasArts agreed to license the SCUMM technology to Humongous only because it wanted to help a departing employee, but even then only because Humongous was going to be an independent publisher.

Counsel for LucasArts emphasized repeatedly during oral argument that but for the inclusion of the price restriction provision in § A.1.1.1(b) in the agreement, LucasArts would never have agreed to license its valuable SCUMM technology to Humongous.

Yet, LucasArts' argument is directly contradicted by the declaration of its own General Manager of the Games Division, Douglas Glen, who had primary responsibility for negotiating the terms of the licensing agreement between LucasArts and Humongous. According to Glen, the principal consideration LucasArts received in exchange for its SCUMM software was a commitment from Ron Gilbert, a developer of the SCUMM System and co-founder of Humongous, to maintain and update certain elements of the SCUMM System and to promise that any enhancements and improvements made to the SCUMM System would belong to LucasArts. Glen stated in his declaration that without Gilbert's cooperation, LucasArts' SCUMM projects might have encountered delays and increased programming costs.

In addition, as pointed out by Humongous' counsel, it does not make sense that LucasArts would give away its valuable SCUMM software to a departing employee just because it wanted to help the departing employee or just because the departing employee promised not to sell any SCUMM-based games for less than a certain price. If the SCUMM System is as valuable as LucasArts claims, the principal consideration for the use of the System would have to have been something more valuable, such as promises for continued support and upgrades. Thus, Humongous' failure to abide by § A.1.1.1(b) does not amount to a material failure of consideration.

### C.

The next hoop LucasArts tries to jump through is that the material failure of consideration gives LucasArts the right to rescind its license agreement with Humongous. Although LucasArts correctly asserts that rescission is a remedy where there has been a material failure of consideration (see Cal.Civ.Code § 1550), as explained above, there does not appear to be a material failure of consideration. Even if there is a failure of consideration, LucasArts has not met all the

requirements necessary for rescission. According to Cal.Civ.Code § 1691, rescission is only available if LucasArts restores to Humongous everything of value which LucasArts received under the license agreement. Section 1691 states in relevant part:

[T]o effect a rescission a party to the contract must promptly upon discovery of facts which entitle him to rescind * * * (a) give notice * * * and (b) *restore to the other party everything of value which he has received from him under the contract* * * *.

(Emphasis added).

LucasArts continues to receive support and upgrades for the SCUMM System from Humongous; therefore, LucasArts rescission argument fails.

### D.

After the license agreement is rescinded, LucasArts argues that Humongous' continued use of its copyrighted SCUMM System constitutes copyright infringement. Neither Humongous nor Electronic Arts disputes copyright infringement if the license agreement is rescinded. Electronic Arts does claim, however, that LucasArts misused its copyright by attempting to expand its statutory rights to control distribution and pricing of Humongous' independently created, original work and that such misuse bars LucasArts from bringing an infringement claim. *See e.g., Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970, 976–77 (4th Cir. 1990); *United Tel. Co. of Missouri v. Johnson Publishing Co.,* 855 F.2d 604, 611 (8th Cir.1988). In any event, without a material failure of consideration, there can be no rescission and no copyright infringement.

### E.

Next, LucasArts contends that it will suffer irreparable harm if the court does not enjoin Humongous. It is well-established that if a copyright owner shows a reasonable probability of success on the merits, a court will presume irreparable harm. *See e.g., Johnson Controls, Inc. v. Phoenix Control Systems, Inc.,* 886 F.2d 1173 (9th Cir.1989) ("[I]n a copyright infringement claim, a showing of reasonable likelihood of success on the merits raises a presumption of irreparable harm."); *Apple Computer, Inc. v. Formula Intl., Inc.,* 725 F.2d 521, 525 (9th Cir. 1984). In the present case, because LucasArts failed to show a reasonable likelihood of success on the merits, it is not entitled to a presumption of irreparable harm.

Even if, however, LucasArts succeeded in showing a likelihood of success on its copyright claim, this presumption can be rebutted by a showing that the plaintiff and defendant are not in direct competition. *Dow Jones & Co. v. Board of Trade,* 546 F.Supp. 113, 117 (S.D.N.Y.1982); *Marisa Christina, Inc. v. Bernard Chaus, Inc.,* 808 F.Supp. 356, 358 (S.D.N.Y.1992); *Life Music, Inc. v. Wonderland Music Co.,* 241 F.Supp. 653, 656–57 (S.D.N.Y.1965). In the present case, Humongous' *Putt Putt Joins the Parade* does not appear to compete directly with any games produced by LucasArts. *Putt Putt Joins the Parade* is a game which combines entertainment with certain educational goals. It teaches children about cooperation, problem-solving and safety. Moreover, the video game comes with crayons and a coloring book and is targeted for use by children 3–7 years of age. In contrast, games produced by LucasArts, such as *Indiana Jones and the Last Crusade, Indiana Jones and the Fate of Atlantis, Loom, Maniac Mansion, Monkey Island I, Monkey Island II,* and *Zak McKracken and the Alien Mindbenders* are fantasy, role-playing and simulator games. These games are targeted for players 12 years old and above and require the ability to solve complex puzzles and considerable knowledge of the world. *See* Declaration of Keith Ferrell in Opposition to Motion for Preliminary Injunction. Because Humongous' products do not directly compete with those of LucasArts, LucasArts is not entitled to a presumption of irreparable harm.

Furthermore, LucasArts' allegation that it will suffer actual irreparable harm is unfounded. LucasArts claims that without injunctive relief, Humongous and Electronic Arts will (1) flood the market with SCUMM-based systems, thereby preventing

LucasArts from recovering its research and development costs for the SCUMM System, (2) edge LucasArts out of its "competitive position" in the video game and (3) cause LucasArts to suffer an incalculable loss in profits. These claims are vague, speculative and factually unsupported. Moreover, any loss in profits would be compensable with money damages. As a result, these claim provide insufficient bases upon which to award injunctive relief.

### F.

■ Finally, LucasArts claims that the balance of hardships tips in its favor. The court concludes otherwise. If the court issues an injunction, the results could be disastrous for Humongous. Humongous is a start-up company with limited financial resources. Although it receives some support from Electronic Arts, Humongous depends to a large extent on sales of its products to pay its employees and operating expenses. In addition, Humongous' customers may lose their trust and confidence in the young company's ability to deliver goods on time and may decide to cancel their orders for *Putt Putt Joins the Parade* and other products. Most importantly, all of Humongous' products are based on the SCUMM System, and an injunction would put the start-up company out of business. As stated in the Declaration of Ronald Gilbert in Support of Electronic Arts' Motion to Intervene, the SCUMM System is the "cornerstone of Humongous' business." "Without the SCUMM System, Humongous could not realistically continue in business." Id. at ¶ 2.

In contrast, if the court denied injunctive relief, the worst that would happen is that Humongous might earn some profits to which it is not entitled. If the court later determines that those profits were illegally earned, LucasArts could recover them as damages.

### III.

In short, injunctive relief provides an extraordinary form of relief and is granted only upon a showing of either: (1) likelihood of success on the merits of the copyright claim and possibility of irreparable harm or (2) serious questions going to the merits and a

balance of hardships tipping in LucasArts' favor. Because LucasArts has failed to meet either of the two tests, its motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.