TRIAD SYSTEMS CORPORATION, a California corporation, Plaintiff,

and

Jeffrey J. Lederman; Michael J. Madison, Plaintiffs–Appellants,

v.

SOUTHEASTERN EXPRESS COMPANY, a Georgia de facto partnership, dba Southeastern Brokerage Company and dba Southeastern Systems, Defendants–Appellees.

TRIAD SYSTEMS CORPORATION, a California corporation, Plaintiff–Appellee,

v.

SOUTHEASTERN EXPRESS COMPANY, a Georgia de facto partnership, dba Southeastern Brokerage Company and dba Southeastern Systems; Southeastern Express Systems, Inc., a Georgia corporation; George Barnes, an individual; Kevin Clar, an individual; and Gerry Wambolt, an individual, Defendants–Appellants.

Nos. 94–15818, 95–15552.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 14, 1995.

Decided Aug. 31, 1995.

---

Mary A. Lehman, Gray Cary Ware & Freidenrich, San Diego, CA, for plaintiffs-appellants.

Daniel M. Wall, Charles S. Crompton, III, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for plaintiff-appellee.

Ronald S. Katz, Robert A. Christopher, Richard A. Jones, Coudert Brothers, San Jose, CA, for defendants-appellees, defendants-appellants.

Before: SNEED, CANBY, and FERNANDEZ, Circuit Judges.

SNEED, Circuit Judge:

Southeastern Express Company ("Southeastern") appeals the district court's grant of a preliminary injunction in favor of Triad Systems Corporation ("Triad"). The injunction followed a finding that Southeastern was infringing on Triad's software copyrights.[1]

---

1. Southeastern also attempts to raise several issues regarding Phase One of the trial in this case; however, because the trial is still underway and no final judgment has been entered, see Appellants' Excerpts of Record ("E.R.") at 134, these issues are premature and not properly before this court on appeal. See Fed.R.Civ.Proc. 54(b); *Williams v. St. Louis Diecasting Corp.*, 611 F.2d 1223 (8th Cir.1979).

The terms of the injunction substantially prohibit Southeastern from servicing Triad computer systems. In a consolidated appeal, two of Triad's attorneys, Jeffrey Lederman and Michael Madison ("Lederman and Madison"), appeal the imposition of Rule 11 sanctions against them for filing a misleading declaration in support of Triad's motion for injunctive relief.

For the reasons discussed below, we affirm the grant of the preliminary injunction against Southeastern and reverse the imposition of Rule 11 sanctions against Lederman and Madison.

## I.

### FACTS AND PROCEEDINGS BELOW

Triad manufactures computers for use by automotive parts stores and designs, sells, and licenses unique software to run its computers. The computer systems enable customers in the automotive parts industry to automate their sales, inventory, and accounting tasks. Southeastern is what is known as an independent service organization ("ISO") that services Triad computers.[2] Southeastern and Triad thus compete for the business of servicing and maintaining Triad computers. The crux of Triad's complaint is that Southeastern has infringed on its software copyrights and continues to do so by performing maintenance on Triad computer systems for Triad's licensees.

Triad's copyrighted software includes: (1) operating system software, which is necessary to run any other program on the computer ("OS software"); (2) applications software, which performs the basic functions like accounting and invoicing for the Triad customer; and (3) utilities, diagnostic, and auxiliary software, which is used by technicians to repair Triad software and hardware ("service

software"). The OS software and the service software are involved in this dispute.

Triad software customers are subject to three different contractual arrangements. From 1976 to 1985, Triad sold its software outright to customers ("Regime 1"). Because Regime 1 customers own their software, they have rights under the Copyright Act to make or authorize the making of copies in the operation of their computers.[3] As a result, such copies are noninfringing, even if they are made by Southeastern in the course of servicing Regime 1 customers' computers. Triad therefore concedes that Southeastern cannot be barred from making use of software owned by Regime 1 customers.

In 1986, however, Triad began licensing rather than selling its software ("Regime 2"). Under Regime 2 agreements, customers may not duplicate the software or allow it to be used by third parties. In 1991, Triad added a requirement that licensees selling their computer systems pay Triad a license transfer fee ("Regime 3"). Thus, Southeastern's performance of service and maintenance on the computer systems of Regime 2 and 3 customers is at issue. At stake is the business of servicing these systems.

In order to service a Triad computer, the Southeastern technician uses the OS software and the service software in the Triad customer's possession. Triad argues that Southeastern has infringed its software copyrights because copies of the software are made in the computer's random access memory (RAM) when the computer is in use.[4]

Triad filed suit against Southeastern in federal district court in April 1992. A year later, while discovery was ongoing, this Circuit decided *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir.1993), *cert. dismissed,* — U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994). There we held that

---

**2.** Southeastern also deals in used Triad computers and replacement parts; however, these activities are not at issue on this appeal. The district court granted summary judgment in favor of Triad on Southeastern's claims of tying and monopolization with respect to the spare parts market. E.R. at 100–07.

**3.** *See* 17 U.S.C. § 117.

**4.** Servicing of the computers can also involve other forms of copying: OS software and service software are sometimes copied onto the hard drive in the first instance, and thereafter booted up in RAM, and Southeastern technicians also make backup copies for customers by copying programs off the hard drives onto tapes. *See* E.R. at 79–81.

the loading of MAI's operating system software into RAM makes a "copy" under the Copyright Act, and that therefore Peak, an ISO, had infringed MAI's copyright by operating its customers' MAI computers in order to service them.[5]

Following the *MAI* decision, Triad understandably moved for summary judgment on its copyright infringement claim. Southeastern moved for summary judgment on its fair use and copyright misuse defenses. Both motions were denied.[6] The district court ordered that the trial be bifurcated: Phase One would include Triad's copyright infringement claims, damages, and Southeastern's fair use defense; Phase Two would include Southeastern's copyright misuse defense and any remaining counterclaims.

Phase One proceeded before a jury on January 12, 1995. At the close of the evidence, the district court granted directed verdicts in favor of Triad on Southeastern's fair use defense to infringement of both the OS software and the service software. Then, on February 3, the jury found that Southeastern had infringed Triad's software copyrights.

On March 15, 1995, the district court granted Triad's motion for a preliminary injunction.[7] This was a long step forward for Triad. In essence, the injunction bars Southeastern from performing service or maintenance on Triad computer systems that contain licensed software.[8] Under the terms of the injunction, the onus is on Southeastern to determine whether a particular customer's software is subject to a Regime 2 or 3 license agreement. Triad, however, is obligated to provide the license agreement upon the customer's written request; if it fails to do so within ten business days, Southeastern may service the customer's computer without violating the injunction.

A panel of this court stayed the injunction pending this appeal. While Phase Two of the trial remains in progress, on June 8, 1995, the district court granted summary judgment in favor of Triad on Southeastern's copyright misuse claim. Only a few remaining claims are as yet unresolved.

Southeastern timely appeals the preliminary injunction. This court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## II.

### DISCUSSION

#### A. *Preliminary Injunction*

Southeastern, attacking the preliminary injunction in several ways, argues that (1) Triad cannot show the possibility of irreparable injury, (2) Triad cannot show the likelihood of success on the merits because of Southeastern's meritorious affirmative defenses, (3) the preliminary injunction is too broad and will harm Southeastern, and (4) the district court erred in bifurcating the trial.

■ A district court's order granting preliminary injunctive relief is subject to limited review: It will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Miller v. California Pac. Medical Ctr.*, 19 F.3d 449, 455 (9th Cir.1994) (en banc).

■ To obtain a preliminary injunction in this case, Triad must show a likelihood of success on the merits of its copyright infringement action and the possibility of irreparable injury. *See Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985) (quoting *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 523 (9th Cir.1984)).

#### 1. *Irreparable Injury.*

Southeastern first argues that Triad cannot show a threat of irreparable injury suffi-

---

**5.** Peak did not raise a fair use defense, so the issue is not discussed in the *MAI* opinion.

**6.** Both parties also sought preliminary injunctions at that time, which were likewise denied.

**7.** Injunctive relief is specifically authorized by the Copyright Act, 17 U.S.C. § 502.

**8.** It also bars Southeastern from distributing licensed Triad software in the course of selling used Triad computer systems and from performing any hardware upgrades on Triad computer systems that contain licensed software.

cient to merit injunctive relief. Southeastern, mindful of the economic stakes involved, argues that Triad will suffer only monetary damages from lost revenues, which are not usually considered irreparable harm because of the availability of an adequate legal remedy. *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1202 (9th Cir.1980).

■ In a copyright infringement action, however, the rules are somewhat different. A showing of a reasonable likelihood of success on the merits raises a *presumption* of irreparable harm. *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.,* 886 F.2d 1173, 1174 (9th Cir.1989).[9] The cases to the contrary cited by Southeastern are not controlling and are distinguishable.[10] Thus, Triad need only show a reasonable likelihood of success on its copyright infringement claim to support the district court's grant of the preliminary injunction. *Id.*

### 2. Likelihood of Success on the Merits.

■ To make its required showing of copyright infringement, Triad must prove (1)

ownership of the copyrights and (2) copying of an expression protected by those copyrights. *Johnson Controls,* 886 F.2d at 1175. Triad has shown both. Its ownership of valid copyrights is apparently not in dispute; Triad has produced certificates of registration,[11] which raise a presumption of the validity of Triad's copyrights in its software. 17 U.S.C. § 410(c).

Triad, to show that Southeastern made copies of its protected works, relies on the *MAI* decision. It is clear that Southeastern's activities are "copying" for purposes of the Copyright Act. *MAI,* 991 F.2d at 519. Because Southeastern's service activities involved copying entire programs, there is no doubt that protected elements of the software were copied. *Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1525 (9th Cir. 1992). Therefore, Triad has shown a likelihood of success as to its prima facie case.

### 3. Fair Use.[12]

■ Southeastern argues that, despite Triad's carrying its burden, the preliminary injunction was improper because the district

---

9. "A copyright plaintiff who makes out a prima facie case of infringement is entitled to a preliminary injunction without a detailed showing of irreparable harm." *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *see also Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991) (holding that intangible injuries, such as damage to advertising efforts and goodwill, can be irreparable harm for purpose of a preliminary injunction).

10. The case most on point is *Belushi v. Woodward,* 598 F.Supp. 36 (D.D.C.1984). There, the plaintiff sought a preliminary injunction to prevent sale of a book that contained her copyrighted photograph. The court denied a preliminary injunction despite the plaintiff's likelihood of success on the merits, reasoning that the potential harm to defendants from preventing sale of the book was greater than the harm to plaintiff from allowing its sale, that the legal remedy would be adequate, and that the public interest in free expression weighed against injunctive relief. *Id.* at 37. Here, there is no compelling free speech interest; as the *Belushi* court noted, "If this were a case in which relief would enjoin the distribution of an average commercial product, [such] relief would not be so drastic." *Id.* Moreover,

the *entire* software programs at issue are infringing, as compared to a single photograph out of an entire book, and thus the injunction here does not substantially impinge on legitimate, noninfringing activity.

Southeastern's other citations are less pertinent. *See LucasArts Entertainment Co. v. Humongous Entertainment Co.,* 815 F.Supp. 332, 334, 337 (N.D.Cal.1993) (denying a preliminary injunction because plaintiff failed to show a likelihood of success on its copyright infringement claim); *Love v. Kwitny,* 772 F.Supp. 1367, 1375 (S.D.N.Y.1991) (denying a *permanent* injunction where the infringement was minimal and the "injurious consequences to Love's copyright from continued circulation of Kwitny's book [were], if anything, 'trifling.'"), *aff'd,* 963 F.2d 1521 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 181, 121 L.Ed.2d 127 (1992).

11. *See* Appellee's Supplemental Excerpts of Record ("S.R.") at 364–439.

12. This issue reaches us in a rather strange posture: Before the district court issued the preliminary injunction, it substantially had decided the fair use issue in favor of Triad by granting it a directed verdict during Phase One of the trial. As a result, Southeastern faces great adverse odds in attempting to argue that Triad cannot

court failed to consider adequately its affirmative defenses of fair use and copyright misuse.[13] Because those defenses are clearly meritorious, Southeastern asserts, Triad cannot show that it is likely to succeed on the merits. *See Gould v. Lambert Excavating, Inc.*, 870 F.2d 1214, 1218 (7th Cir.1989).

■ We agree with the district court that the doctrine of fair use does not apply given the facts of this case. "The doctrine of fair use allows a holder of the privilege to use copyrighted material in a reasonable manner without the consent of the copyright owner." *Narell v. Freeman*, 872 F.2d 907, 913 (9th Cir.1989) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549, 105 S.Ct. 2218, 2224–25, 85 L.Ed.2d 588 (1985)); *see* 17 U.S.C. § 107.[14] Southeastern relies on the rationale of *Sega v. Accolade, supra*, to find that its service activities are a fair use of Triad's copyrighted software.

*Sega*, however, was a very different case. There, the defendant, Accolade, had made copies of Sega's video game programs in the process of reverse-engineering them solely in order to figure out the requirements for compatibility with Sega's "Genesis" game console. The functional requirements of compatibility were not protected by copyright, and there was no other method available to Accolade to discover those requirements. 977 F.2d at 1522. This court held that the copying at issue was a fair use. We determined (1) that Accolade had made the copies "for a legitimate, essentially non-exploitative purpose," that is, determining the compatibility requirements; (2) that the copying resulted in the proliferation of independent, creative expression, by making Accolade game programs compatible with the Sega Genesis system, an outcome the Copyright Act was intended to promote; and (3) that the copying neither adversely affected the market for Sega's own video games, nor pirated those games, but only used the unprotected elements needed to make its own games compatible. *Id.* at 1523.

Southeastern's activities are wholly unlike the reverse-engineering in *Sega*. Southeastern did not make a minimal use of Triad's programs solely to achieve compatibility with Triad's computers for Southeastern's own creative programs. Rather, Southeastern has invented nothing of its own; its use of Triad's software is, in the district court's words, "neither creative nor transformative and does not provide the marketplace with new creative works."[15] *See id.* at 1523.

show the likelihood of success on the merits. Nonetheless, we proceed to examine the fair use issue to show that the district court did not commit reversible error in its analysis of Southeastern's fair use defense in deciding to issue the preliminary injunction.

Southeastern also tries to argue that the district court erred in granting a directed verdict in favor of Triad on the fair use issue. However, that issue is not properly before the court at this time because the case has not yet reached a final judgment. *See* Fed.R.Civ.Proc. 54(b); *Williams*, 611 F.2d 1223.

13. Southeastern also argues that the district court erred by failing to consider its antitrust counterclaims in its decision to issue the preliminary injunction. It appears, however, that the district court was not even obliged to consider such counterclaims once Triad showed the likelihood of success on its copyright infringement claim. *See Helene Curtis Indus. v. Church & Dwight Co.*, 560 F.2d 1325, 1335 (7th Cir.1977) (affirming grant of preliminary injunction upon plaintiff's showing of likelihood of success on trademark infringement claim and rejecting defendant's argument that its antitrust counterclaims should have precluded injunction; "antitrust violations are not a general defense to a

trademark infringement claim"), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978). Even assuming the district court should have considered them, however, Southeastern cannot prevail. The district court explicitly found that the antitrust counterclaims were not likely to succeed on the merits when it rejected Southeastern's motion for a preliminary injunction. *See* E.R. at 108–17. The district court's findings are neither clearly erroneous nor based on an erroneous legal standard. *Miller*, 19 F.3d at 455.

14. The Copyright Act sets out four factors for determining whether a use is a fair use:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

15. E.R. at 466.

Southeastern is simply commandeering its customers' software and using it for the very purpose for which, and in precisely the manner in which, it was designed to be used. As a result, the copies made by Southeastern while servicing Triad computers have undoubtedly diminished the value of Triad's copyright. *See id.* As the district court reasoned: "If ISOs like Southeastern freely used Triad's copyrighted software on a widespread basis to compete with Triad, this would likely cause a significant adverse impact on Triad's licensing and service revenues and lower returns on its copyrighted software investment." [16] To allow Southeastern to use Triad's software as it wishes would cause Triad to lose licensing revenues from the ISOs, who "have a substantial motivation to obtain access" to Triad's software.[17] *See Advanced Computer Serv., Inc. v. MAI Sys. Corp.,* 845 F.Supp. 356, 366 (E.D.Va.1994). In short, we detect no appreciable public benefit arising from Southeastern's practice to justify this continuance under the fair use doctrine. *See Sega,* 977 F.2d at 1523. We therefore agree with the district court's thoughtful analysis and its rejection of Southeastern's fair use claim.

■ Southeastern also contends that the district court's analysis was flawed because Triad's copyright does not extend to the service market. We disagree. Triad invented, developed, and marketed its software to enable its customers and its own technicians to service Triad computers. Southeastern is getting a free ride when it uses that software to perform precisely the same service. Triad is entitled to licensing fees from Southeastern and other ISOs that make use of Triad's software in servicing Triad computers. Furthermore, a finding of fair use is unwarranted because the other relevant factors weigh against such a finding. Not only is Southeastern's use of Triad's software entirely commercial in nature, *see Sega,* 977 F.2d at 1522, but also both the OS and the service software are protected expression, and Southeastern is copying programs in their entirety, *see id.* at 1526. *See Advanced Computer Serv.,* 845 F.Supp. at 366 n. 13.

### 4. *Copyright Misuse.*

■ Not surprisingly, we also conclude that Southeastern cannot show that it is likely to prevail on its asserted copyright misuse defense. The district court properly granted summary judgment on this claim in favor of Triad. It found that, unlike the case of *Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970, 978–79 (4th Cir.1990), Triad did not attempt to prohibit Southeastern or any other ISO from developing its own service software to compete with Triad. District Court's Order of June 8, 1995, at 7; *see also Advanced Computer,* 845 F.Supp. at 366–67. We agree.

### 5. *Overbreadth and Harm to Southeastern.*

■ Southeastern's most plausible claim, that the injunction is too broad because it effectively prevents Southeastern from engaging in legitimate service activities even for Regime 1 customers, also fails. We find that Southeastern is not prevented from performing such service; rather, the injunction properly requires Southeastern to determine which customers own their software under Regime 1, and which are mere licensees under Regimes 2 and 3. Putting this burden on Southeastern is appropriate because Southeastern is the infringer.[18]

Were Triad able to obscure or manipulate which machines fell under which types of agreement, our attitude with respect to this issue might have been different. But that is not the case. The injunction requires Triad to ascertain the status of any computer that Southeastern seeks to service, and it allows Southeastern to perform such service without violating the injunction where Triad fails to provide the requested information. We find that this arrangement is sufficient to prevent any abuse. Therefore, we hold that the district court did not abuse its discretion in issuing the injunction.

---

**16.** E.R. at 468.

**17.** *Id.* at 468–69.

**18.** This arrangement is also appropriate because it appears that the majority of Triad computer owners are subject to license agreements and do not own their software outright under Regime 1.

**1338**

Southeastern, we suppose accurately enough, argues that the injunction will cause it to suffer extensive harm as a result. Nonetheless, the argument fails. Southeastern cannot complain of the harm that will befall it when properly forced to desist from its infringing activities. "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration [on an appeal from a preliminary injunction].'" *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir.1988); *accord Apple Computer*, 714 F.2d at 1255 (in motion for preliminary injunction, district court should not consider the "devastating effect" of the injunction on the infringer's business).

### 6. *Bifurcation.*

■■■ Finally, Southeastern contends that the district court erred in dividing the trial into two phases, one involving the copyright action and the other involving Southeastern's antitrust counterclaims. We review that decision by way of an abuse of discretion standard. *Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 575 (9th Cir.1995), *petition for cert. filed*, 64 U.S.L.W. 3070 (July 24, 1995) (No. 95–129). Southeastern claims that bifurcation prevented consideration of its copyright misuse defense and antitrust claims in conjunction with the infringement action. This was error, Southeastern argues, because its counterclaims will affect the outcome of the case. Once more, we must reject Southeastern's argument.

■■■ As Triad correctly points out, a party seeking a preliminary injunction ordinarily is granted relief *before* trial. That is its purpose. Therefore, the fact that some claims in this case have already been reached and others not is irrelevant to the issuance of a preliminary injunction. Furthermore, Triad's copyright infringement claim and Southeastern's antitrust claims are discrete issues, involving separate, complex bodies of law. The district court justifiably did not want the jury to muddle the two. There was no abuse of discretion.

### B. *Rule 11 Sanctions*

We turn now to Lederman's and Madison's appeal regarding the sanctions imposed on them under Rule 11 of the Federal Rules of Civil Procedure.

### 1. *Facts.*

In October 1992, Triad, in a then unsuccessful motion for a preliminary injunction against Southeastern, supported its motion with the declaration of David Mullen, Triad's field service coordinator ("the Mullen declaration"). Ten months later, Southeastern deposed Mullen and questioned him at length about his declaration. Mullen had difficulty answering questions and at times contradicted his declaration statements.

As a result, Southeastern filed a motion seeking sanctions under Rule 11 and the court's inherent powers against Triad and both its present counsel, McCutchen, Doyle, Brown & Enersen, and its former counsel, Ware & Friedenrich, which had represented Triad during the preliminary injunction motion. McCutchen, Doyle filed a motion in opposition, arguing that, under the applicable version of Rule 11, sanctions could only be imposed against the person signing the document and not against a law firm generally.

On April 7, 1994, the district court granted Southeastern's motion. Acknowledging that it could not sanction the law firm, Ware & Friedenrich, the district court instead imposed Rule 11 sanctions of $500 each against Lederman and Madison, the attorneys involved in the preparation of the Mullen declaration.

### 2. *Jurisdiction.*

■■■ To forestall an argument on the merits, Southeastern first contends that this court lacks jurisdiction over an appeal from the imposition of sanctions. This is incorrect. We have jurisdiction over the appeal under the collateral order doctrine. *Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*, 760 F.2d 1045, 1047 n. 1 (9th Cir.1985). An order imposing Rule 11 sanctions upon counsel, a nonparty, is final and appealable by the attorney sanctioned upon imposition of the sanction. *Rachel v. Banana Republic, Inc.*,

831 F.2d 1503, 1508 n. 5 (9th Cir.1987); *Optyl Eyewear*, 760 F.2d at 1047 n. 1.

### 3. *Merits.*

 Lederman and Madison argue that the district court erred by sanctioning them. They maintain that under the then-current version of Rule 11, only a person whose signature was on the declaration could be subject to sanctions. Southeastern, on the other hand, insists that sanctions were appropriate because Lederman and Madison were actively involved in the preparation of the misleading declaration, and because Triad's brief, which did bear their signatures, was misleading inasmuch as it relied heavily on the Mullen declaration. We find that the order imposing sanctions on Lederman and Madison was improper and cannot stand.[19]

Until Rule 11 was amended in 1993, subsequent to the Mullen declaration, a bright-line rule applied: Only the individual attorney who actually signed the court paper could be sanctioned because of its contents. *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989); *Giebelhaus v. Spindrift Yachts*, 938 F.2d 962, 965 (9th Cir.1991); *see also id.* at 966 (holding that an attorney's typewritten name on a pleading is not a signature for purposes of Rule 11 and therefore does not subject him to sanctions). As the Supreme Court has explained:

We held in *Pavelic & LeFlore* that Rule 11 contemplates sanctions against the particular individual who signs his or her name, not against the law firm of which that individual is a member, because "the purpose of Rule 11 as a whole is to bring home to the *individual signer* his personal, nondelegable responsibility . . . to validate the truth and legal reasonableness of the papers filed."

*Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 546–47, 111 S.Ct. 922, 930–31, 112 L.Ed.2d 1140 (1991) (quoting *Pavelic & LeFlore*, 493 U.S. at 126, 110 S.Ct. at 459–60) (emphasis added);[20] *see also* Fed.R.Civ.P. 11 ("Every pleading, written motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record *in the attorney's individual name* . . . .") (emphasis added) (prior to 1993 amendment).

 Inasmuch as Lederman and Madison did not sign the Mullen declaration, they cannot be sanctioned based on its misleading nature.[21] Southeastern nonetheless urges us to uphold the sanctions order because Triad's brief, which Madison apparently did sign, must also have been misleading because it relied heavily on the Mullen declaration. We need not consider whether the district court *could* have chosen to sanction Lederman and Madison on this basis, because it did not. The district court's order is based exclusively on the misleading nature of the Mullen declaration.[22] No factual findings were made re-

---

**19.** Though this court reviews orders imposing Rule 11 sanctions for an abuse of discretion, "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law. . . ." *Giebelhaus*, 938 F.2d at 964 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990)).

**20.** The Court extended this reasoning in *Business Guides* to apply the certification requirement of Rule 11 to represented parties who sign court papers, even where they are not required to do so. 498 U.S. at 543, 546–47, 111 S.Ct. at 930–31.

**21.** *Giebelhaus*, 938 F.2d at 965; *see also Pony Express Courier Corp. of Am. v. Pony Express Delivery Serv.*, 872 F.2d 317, 319 (9th Cir.1989) (holding that co-counsel who did not sign the answer could not be held liable under Rule 11 for its contents). Southeastern's argument that

Lederman and Madison were involved in the preparation of the declaration is to no avail. Southeastern relies heavily on a district court case, *Mercury Serv., Inc. v. Allied Bank of Texas*, 117 F.R.D. 147 (C.D.Cal.1987), *aff'd*, 907 F.2d 154 (9th Cir.1990). There, the court imposed sanctions under Rule 11 and its inherent powers against both the bank and its counsel for filing the declaration of one of the bank's vice-presidents, which was later revealed not to be based on personal knowledge. To the extent that the court's holding rests on its power under Rule 11 (which is not clear from the text of the decision), however, the case is no longer good law in light of the Supreme Court's decisions in *Pavelic & LeFlore* and *Business Guides*. *See Giebelhaus*, 938 F.2d at 965 ("Absent a signature, [the attorney's] relationship to the litigation is irrelevant under the express terms of Rule 11.") (citing *Pavelic & LeFlore*).

**22.** *See* E.R. at 150–200.

garding Triad's brief or any other paper filed in this action. Furthermore, the district court clearly stated that it was sanctioning Lederman and Madison under Rule 11 and not under the court's inherent powers. As a result, there is no available alternative basis for upholding the sanctions. We must set aside the sanctions imposed on Lederman and Madison.

AFFIRMED AS TO THE PRELIMINARY INJUNCTION; REVERSED AS TO THE IMPOSITION OF SANCTIONS.

STATE OF ALASKA, Plaintiff–Appellee,