**SONY COMPUTER ENTERTAIN-
MENT INC., et al., Plaintiffs,**

v.

**CONNECTIX CORPORATION,
Defendant.**

No. C–99–0390–CAL.

United States District Court,
N.D. California.

April 20, 1999.

Joel Linzner, Townsend & Townsend & Crew LLP, San Francisco, CA, Riley R. Russell, Sony Computer Entertainment America, Inc., Foster City, CA, for plaintiffs.

William Sloan Coats, Howrey & Simon, Menlo Park, CA, Bonnie E. Fought, Connectix Corporation, San Mateo, CA, for defendant.

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

LEGGE, District Judge.

Now before the court is plaintiff's motion for a preliminary injunction. On Jan-

uary 27, 1999 plaintiff Sony filed its complaint alleging copyright infringement and other causes of action against defendant Connectix Corporation. Since that date, Sony made two applications for temporary restraining orders against Connectix' product, the Virtual Game System ("VGS"). This court granted the second application for a temporary restraining order, for the reasons stated on the record in open court on March 11, 1999. After expedited discovery by the parties, the present motion was filed. Sony has also amended its complaint, but this motion for a preliminary injunction is evaluated in the context of plaintiff's original complaint.

Sony asserts that it is likely to prevail on three claims—copyright infringement, circumvention of technological protection measures, and trademark dilution. For purposes of this motion, the central allegation is copyright infringement. Sony argues that in developing its VGS, Connectix unlawfully copied and used Sony's BIOS code. While Sony concedes that the completed VGS machine does not now contain any of plaintiff's copyrighted material, Sony asserts that the product was unlawfully created by the use of plaintiff's copyrighted code. Sony also contends that the VGS tarnishes its famous PlayStation trademark, because PlayStation games do not run as well on defendant's emulation machine as they do on a PlayStation console. Sony seeks to enjoin Connectix from using Sony's BIOS in the development of its products, and from selling the VGS products made from the use of Sony's code.

The issues have been fully briefed by the parties. Oral argument was heard on April 9, 1999 and the matter was submitted. The court has carefully reviewed the moving and opposing papers, the documents and declarations filed in support and opposition, the parties' arguments and the applicable authorities. For the reasons discussed below, the court concludes that Sony's motion for preliminary injunction must be granted.

## I.

Plaintiffs Sony Computer Entertainment, Inc. and its subsidiary Sony Computer Entertainment America (collectively called "Sony") are the developers, manufacturers and distributors of the Sony PlayStation and PlayStation games. They also license other companies to make games that can play on the PlayStation system. "PlayStation" is a registered trademark of Sony. The PlayStation system consists of a console, controllers, and software that are designed to produce a three-dimensional game for play on a television monitor connected to the console.

Sony expended over three years and approximately $500 million to develop the PlayStation video game system. Since its release in the United States in September 1995, Sony has spent an additional $100 million to promote the system. Sony is a leader in the video game console business by selling over twenty million PlayStations worldwide.

The parties essentially agree on the composition of the PlayStation system. The PlayStation console consists of numerous *hardware* components, including a MIPS R3000 Central Processing Unit (CPU), Geometry Transfer Engine (GTE), Data Decompression Engine (MDEC), Memory—main RAM, video RAM, sound RAM, and CD ROM buffer—Graphics Processing Unit (GPU), Sound Processing Unit (SPU), Graphics Chip, CD–ROM Drive, Game Pad and Serial Port. The GTE and the GPU are custom built microprocessors designed by Sony's engineers for the PlayStation. These chips perform the complex mathematical calculations necessary to produce realistic 3–D graphics. Sony considers the processes performed by the GTE and GPU chips to be company trade secrets.

The console also contains *firmware*, which is the equivalent of an operating system, that resides in a ROM chip. The

firmware is the Sony BIOS.[1] Sony holds copyright registrations on its BIOS program. Sony's policy is not to authorize anyone to distribute its BIOS program independent of its inclusion in the PlayStation console, nor to authorize anyone to copy the BIOS for any purpose. The source code for the BIOS is never disseminated by Sony outside the company.

The source code[2] of the Sony BIOS consists of a combination of C source code and R3000 microprocessor assembly language. Tools are used to compile and link this source code into a series of instructions that can be executed by the R3000 microprocessor in the PlayStation. The tools produce a file of binary data that is written into the ROM device. The R3000 microprocessor reads instructions from this ROM.

The operation of the PlayStation is also controlled by a PlayStation video game that is placed in the CD–ROM drive of the console. The video game program sends function calls to the BIOS of the PlayStation console.

The PlayStation console also includes several technological protection measures, which prevent a user from playing a counterfeit PlayStation game. Two of these technological protection measures are relevant to this motion. One is that PlayStation games include a computer program known as PlayStation Library Code. Sony owns a copyright on its Library Code. Sony licenses its copyrighted Library Code and PlayStation trademark to a number of independent video game developers, for the purpose of making games compatible with the PlayStation. The PlayStation console cannot play a PlayStation game unless it contains the copyrighted Library Code. Another protection measure is that PlayStation games contain WIZ Code. The WIZ Code operates as a gatekeeper to the

Library Code. The WIZ Code distinguishes a genuine PlayStation game from a counterfeit. The PlayStation console must read the WIZ Code before it can access the Library Code.

## II.

Defendant Connectix Inc. is a developer, manufacturer and marketer of computer software products. Its VGS is called an "emulator," a software program which individuals install on their computers. That software program is designed to emulate a Sony PlayStation, allowing certain computers to run Sony PlayStation games. At this time, Connectix has developed its VGS for Macintosh computers only. Connectix is currently developing a VGS for Windows, and is scheduled to debut its VGS for Windows in May 1999.

The VGS plays many PlayStation games, but admittedly not as well as when those games are played on a PlayStation console. Connectix specifically includes a disclaimer on its packaging which states that not all PlayStations games are compatible and that some mechanical problems in the running of the games may occur.

## III.

The parties agree that in order to develop a PlayStation emulator, Connectix needed to emulate both the PlayStation *hardware* (i.e., GTE, GPU, etc.) and the *firmware* (the Sony BIOS).

Connectix began developing VGS around July 1, 1998. In developing the VGS, Connectix decided to first emulate the PlayStation's hardware. Connectix admits that during the early stages of the project, Connectix' engineers used the Sony BIOS to develop the hardware emulator.

Connectix' engineers obtained a copy of the Sony BIOS from the Internet. Appar-

---

1. "BIOS" is an acronym for "basic input-output system."

2. Source code is software in a human readable form that is written by the software devel-

oper. Object code is software in a computer readable form, also referred to as binary data (1's and 0's).

ently, the engineers downloaded a copy of the BIOS (object code version) from the Internet and stored the BIOS on its computer hard drives. However, the downloaded BIOS was an outdated Japanese version. After developing a portion of the VGS hardware, Connectix discovered that the BIOS it was using was the "wrong" version.

After this discovery, Connectix' Chief Technical Officer purchased a Sony PlayStation, broke it apart, and took out the ROM chip containing the BIOS. The contents of that ROM chip were downloaded onto a disk. Connectix' engineers then used this disk to continue their development of the VGS, both the hardware and their own BIOS.

During its development of the VGS, Connectix contacted Sony and requested "technical assistance" from Sony to complete the development of VGS. A meeting occurred sometime in September 1998. Connectix wanted Sony's help to understand the PlayStation's firmware and anti-counterfeit programs. However, Sony declined Connectix's request.

It is undisputed that the early version of VGS contained the complete, unchanged Sony BIOS. Prior to the meeting with Sony, Connectix had not taken any steps to develop its own BIOS. The evidence shows that Connectix did not begin developing its own BIOS until after Sony declined Connectix' request for technical assistance, sometime in October 1998.

As its final step in the VGS development, Connectix replaced the Sony BIOS code with its own BIOS code. Connectix completed VGS for Macintosh computers some time in late December 1998 or early January 1999. The product was announced at the MacWorld Expo on January 5, 1999. At MacWorld, Connectix specifically marketed VGS as a "PlayStation emulator"—VGS permits users to play "their favorite PlayStation games" without the need to purchase a PlayStation console.

## IV.

■ A district court may award preliminary injunctive relief if the moving party demonstrates "either a likelihood of success on the merits and the possibility of irreparable injury or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 826 (9th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998). These formulations of the standard are not separate tests, but represent two points on a sliding scale in which the degree of necessary harm decreases as the probability of success on the merits increases. *Dr. Seuss Enterprises, L.P. v. Penguin Books,* 109 F.3d 1394, 1396 fn. 2 (9th Cir.1997), *cert. dismissed,* 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997).

■ In copyright and trademark cases, irreparable injury is presumed upon a showing of likelihood of success on the merits. *Cadence Design Systems, Inc.,* 125 F.3d at 826–27 (copyright); *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1220 (9th Cir.1987) (trademark).

## V.

Sony first argues that it has shown a likelihood of success on its copyright infringement claim because Connectix admits to copying and using Sony's BIOS code.

■ A copyright owner enjoys the exclusive right to reproduce a copyrighted work, to prepare derivative works based on the copyrighted work, and to distribute a copyrighted work. *See* 17 U.S.C. § 106(1), (2) and (3). To prove copyright infringement, a plaintiff must show two elements: (1) ownership of a valid copyright, and (2) copying of expression protected by the copyright. *Triad Systems Corp. v. Southeastern Express Co.,* 64 F.3d 1330, 1335 (9th Cir.1995).

Sony has provided a copy of its Certificate of Registration with the Copyright Office for its BIOS code, and its ownership under Berne Convention procedures. This raises a presumption of the validity of Sony's copyright in its BIOS code. *See* 17 U.S.C. § 410(c). Defendant has not rebutted this presumption.

Sony's copyright infringement claim is based on a theory of intermediate infringement. Sony alleges that Connectix is guilty of two distinct forms of intermediate infringement: First, Sony contends that during the development of both the Macintosh and Windows versions of VGS, Connectix repeatedly duplicated Sony's BIOS code in its entirety and used those copies while it developed a computer program that emulates the hardware components of the PlayStation console. Second, Sony contends that Connectix disassembled Sony's BIOS in order to develop its own VGS BIOS by gradually replacing elements of Sony's code with its own.

▮ Connectix does not address Sony's argument regarding the alleged intermediate infringement, nor does Connectix address the authorities cited by Sony. Instead, Connectix argues that Sony's copyright claim fails because Sony has not met the preliminary burden of establishing that Sony's BIOS is entitled to copyright protection. Connectix argues that Sony must perform a so-called "filtration analysis" to demonstrate that its BIOS constitutes protected expression. *Computer Associates v. Altai*, 982 F.2d 693, 707 (2nd Cir.1992). The Ninth Circuit also discussed the filtration test in *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir.1994). In determining *whether* unlawful copying has occurred, it is appropriate to use a two-part test "having 'extrinsic' and 'intrinsic' components." *Id.* In brief, the *extrinsic test* considers whether there are substantial similarities in both ideas and expression based on external criteria. *Id.* The *intrinsic test* measures similarity of expression from the standpoint of the ordinary reasonable

observer, with no expert assistance. *Id.* The intrinsic test measures expression subjectively and compares the works "as a whole." *Id.* at 1443.

Sony responds that a filtration analysis is not necessary because Connectix has admittedly *copied* and *used* Sony's copyrighted work in its entirety. Sony cites *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1373 (10th Cir.1997). This court agrees that a filtration analysis is not applicable in the present case, because of the Ninth Circuit's holdings in *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517–519 (9th Cir.1993), and *Triad Systems Corp.*, 64 F.3d at 1335.

In *MAI Systems Corp.*, the Ninth Circuit held that a "copying" for purposes of copyright law occurs when a computer program is transferred from a permanent storage device to a computer's RAM. The court explained that a company's loading of copyrighted computer software onto the memory of its central processing unit causes a copy to be made. *MAI Systems Corp.*, 991 F.2d at 518. In the absence of the express permission of the copyright owner, such an act constitutes copyright infringement. *Id.* The district court in *MAI Systems Corp.* did not perform a filtration analysis because the entire copyrighted operating system had been used in the accused's computer.

Further, in *Triad Systems Corp.* the Ninth Circuit took the *MAI Systems Corp.* holding a step farther. The Ninth Circuit explained that when an entire computer software program is copied, there is no doubt that protected elements of the software were copied. *Triad Systems Corp.*, 64 F.3d at 1335 *citing Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1525 (9th Cir.1992). In the wholesale copying of a copyrighted operating system, a filtration analysis is not necessary. *Id.*

The present case is indistinguishable from *MAI Systems Corp.* and *Triad Systems Corp.* Connectix concedes that the Sony BIOS is an operating system for a

computer. Also, Connectix admits that it copied Sony's BIOS in its entirety. The primary engineers of the VGS testified to this fact in their depositions. Two complete "base" copies were made of the Sony BIOS—one was allegedly downloaded from the Internet, and the other came from the ROM chip inside the PlayStation console. It is this admitted wholesale copying of the protected Sony BIOS which constitutes a "copy" under the Copyright Act. And the Connectix engineers admitted that they used the copies to develop the emulator of Sony's hardware, and to gradually convert Sony's code to their own code.

Defendant has submitted supplemental declarations of their engineers, which were made *after* their depositions were taken. Defendant says that the later declarations are to "put [their] responses to [plaintiff's counsel's] questions in context for the Court, because the answers could be misleading otherwise." The court has not attributed much weight to those supplemental declarations. The declarations directly contradict the engineers' deposition testimony. In their supplemental declarations, both engineers make retractions of their deposition testimony or provide placating explanations which defuse their testimony. But it is their deposition testimony which is most significant. *See e.g. Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir.1975) (a party cannot create an issue of fact in a motion for summary judgment by a subsequent declaration contradicting his or her own deposition testimony).

Connectix argues that it had to copy and run the entire Sony BIOS "to understand" and "to study" the BIOS' functional elements. This argument is misplaced in the present step in the analysis. That is, Connectix' reasons for its copying and use of the Sony BIOS involve an alleged defense, which only becomes relevant in the later "fair use" defense analysis. At this stage of the motion, Connectix admits to copying and using the entire Sony BIOS. This is unlawful copying under the Copyright Act. In light of this, there is no doubt that protectable material was copied by Connectix. Sony has shown a likelihood of success as to its prima facie case.

## VI.

This conclusion however does not end the court's analysis. Even though Sony has established a strong showing of copyright infringement, Connectix has asserted a "fair use" defense under 17 U.S.C. § 107.

■ Fair use is an equitable rule requiring a balancing of multiple factors "in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). The fair use defense "permits courts to avoid rigid application of the copyright statute when, it would stifle the very creativity which that law is designed to foster." *Dr. Seuss Enterprises, L.P.*, 109 F.3d at 1399, *quoting Iowa State Univ. Research Found., Inc. v. American Broadcasting Cos.*, 621 F.2d 57, 60 (2nd Cir. 1980). The burden of proof on the fair use defense is on Connectix. *Acuff-Rose Music, Inc.*, 510 U.S. at 590, 114 S.Ct. 1164; *see also Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 107 (2nd Cir.1998) (fair use is an affirmative defense to a claim of infringement, the burden of proof is on its proponent).

There are four factors to be considered and weighed by the court in determining if a fair use defense exists in a given case: (1) the purpose and character of the accused use; (2) the nature of the copyrighted work; (3) the importance of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the accused's use on the potential market for or value of the copyrighted work. *See* 17 U.S.C. § 107.

Sony initially argues that Connectix is barred from asserting fair use as a defense because it has acted in "bad faith" with regards to its development of the VGS. *Adobe Systems Inc. v. Southern Software,*

*Inc.,* 1998 WL 104303, 1998 U.S.Dist. LEXIS 1941, \*18, 45 U.S.P.Q.2d 1827 (N.D.Cal.1998). Most of Sony's arguments regarding Connectix' "bad faith" arise from Connectix' alleged use of improperly downloaded confidential and proprietary Sony documents from the Internet. Sony argues that Connectix admittedly made multiple copies of the Sony BIOS for months during its development of VGS, starting from the bootleg copies found on the Internet. Sony concludes that intermediate copying may be fair use only if the user has copied an *authorized* copy of the original work.

This issue is not relevant or necessary to the present motion. Sony has amended its complaint to allege the improper use of the material downloaded from the Internet, and will apparently argue that it is a ground for a further motion for a preliminary injunction. But the record is presently incomplete on this issue. And the court need not now address it for purposes of the present motion. The court therefore examines the four fair use factors. In that context, it is clear that defendant's copying and use of the BIOS from the Sony PlayStation was not authorized:

■■■ (1) The first factor is the purpose and character of the use, and whether the use is for a commercial purpose. The central purpose of this inquiry is to see whether the new work merely "supersedes the objects" of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message. *Acuff–Rose Music Inc.,* 510 U.S. at 579, 114 S.Ct. 1164. It asks whether and to what extent the new work is "transformative." *Id.* The fact that copying is for a commercial purpose weighs against a finding of fair use. *Sega,* 977 F.2d at 1522 *citing Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). However, the presumption of unfairness that arises in such cases can be rebutted by the characteristics of a particular commercial use. *Id.*

Sony argues that Connectix' copying and use of the BIOS was for a purely commercial purpose. Connectix developed VGS to directly compete with the PlayStation. This is demonstrated by the fact Connectix markets its product as a substitute for PlayStation. VGS has the intended purpose of rivaling the PlayStation. Sony also argues that the VGS is not a transformative work. Connectix used the Sony BIOS to develop a product which does the same thing as a PlayStation. VGS is made to be a replacement for Sony's PlayStation.

In response, Connectix argues that it did not copy the BIOS for a *direct* commercial purpose; i.e., Connectix never sold or distributed a version of the VGS that *contained* the Sony BIOS. This argument is insufficient. While Connectix' final product does not *contain* any copyrighted code, Connectix demonstrated and promoted its "substitute" PlayStation product with Sony's BIOS in the VGS prototype. And it used Sony's BIOS to build both its hardware emulator and its own code.

Connectix argues that the VGS is transformative because it operates on a different platform—a computer instead of a television. But the VGS supplants Sony's prior invention. Connectix concedes that the VGS contains the same components as a PlayStation. The VGS does not do anything new, anything different, or anything unique from the PlayStation. It plays PlayStation games on a visual platform. A computer monitor and a television screen are interchangeable for purposes of this analysis.

Finally, Connectix contends that its activities are identical to those of Accolade in *Sega.* Accolade developed video games that were compatible with Sega's game platform. Here, Connectix argues that it developed a game platform that is compatible with Sony's video games. This case is distinguishable from *Sega.* In *Sega,* Accolade had made copies of Sega's video game

programs in the process of reverse-engineering them solely in order to figure out the requirements for compatibility with Sega's game platform. *Sega,* 977 F.2d at 1514–1515. Accolade then developed its *own games* to operate for the Sega platform. Accolade created something new. Here, Connectix is not creating its own product to be used *in conjunction with* Sony's PlayStation. Rather, VGS is a *substitute* product. It is undisputed that VGS was developed as a replacement for PlayStation.

Based on the evidence before the court, the first fair use factor favors Sony.

(2) The second factor is the nature of the copyrighted work. This factor recognizes that creative works are "closer to the core of intended copyright protection" than informational and functional works, "with the consequence that fair use is more difficult to establish when the former works are copied." *Acuff–Rose Music Inc.,* 510 U.S. at 586, 114 S.Ct. 1164.

Sony argues that while its BIOS constitutes a computer program, it is nevertheless a creative work. It is creative, Sony explains, because of how it is structured; i.e., how the programmer decided to express the elements. Connectix copied that expression. Connectix argues that this factor favors it, because Sony's BIOS is an invisible, utilitarian operating system and is afforded a lower level of protection. *Sega,* 977 F.2d at 1520. Further, Connectix contends that it "had to" copy the Sony BIOS to access the unprotected elements. This is permitted by *Sega. Id.*

In *Sega* the Ninth Circuit stated that because of the nature of computer programs, disassembly of computer program code *could be* fair use if it was for the purpose of studying the unprotectable ideas contained in the copyrighted software, and if it was *the only way* to gain access to and understand those ideas. *Id.* at 1527. However, Connectix' engineers have admitted that they disassembled Sony's code not just to study the concepts.

They actually used that code in the development of defendant's product.

Based on the deposition testimony of Connectix' primary engineers of the VGS, this factor favors Sony. Connectix attempts to bring its actions within *Sega* by submission of the later declarations of its engineers and the declaration of an expert. The court has discussed the supplemental declarations above. Defendant's expert did not consider the *depositions* of the engineers in formulating his opinions. And his opinions cannot contradict the engineers' statements of fact as to what they did.

(3) The third factor is the amount and substantiality of the portions used. Any conclusion with respect to this factor requires analysis of both the quantity and quality of the alleged infringement.

The record is that Connectix copied and used *all* of Sony's BIOS in the development of the VGS. Sony contends that this wholesale copying militates against finding fair use. *Marcus v. Rowley,* 695 F.2d 1171, 1176 (9th Cir.1983).

Connectix argues that the court should give little weight to the extent of intermediate copying, because the final product contains *no* copyrighted materials. *Sega,* 977 F.2d at 1526–27 (where the ultimate (as opposed to direct) use is limited, the factor is of little weight).

However, Connectix' copying of the Sony BIOS was both quantitatively and qualitatively substantial. First, Connectix admits to copying the entire Sony BIOS. Connectix also admits that it used the BIOS daily while it was developing the hardware emulation portion of its VGS. The Sony BIOS was never disassembled during this time. Rather, it was used its entirety. Further, Connectix admits that it used the whole Sony BIOS when it was first developing its own BIOS. It is undisputed that the Sony BIOS is the vital component of the PlayStation console. The BIOS is what makes the PlayStation function. Here, Connectix copied and

used this core component in its entirety. Taking the heart of the original, and making it the heart of a new, is to purloin a substantial portion of the essence of the original. *Acuff–Rose Music Inc.*, 510 U.S. at 587, 114 S.Ct. 1164.

The record demonstrates both substantial quantitative and qualitative copying. The third factor favors Sony.

(4) The fourth factor is the effect of the use upon the potential market for or value of the copyrighted work. This factor requires courts to consider not only the extent of market harm caused by the actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impart on the potential market" for the original. *Acuff–Rose Music, Inc.*, 510 U.S. at 590, 114 S.Ct. 1164 *quoting* 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][4], p. 13–102.61 (1993).

Both parties submit expert declarations from economists regarding the market impact of the VGS on Sony. The parties agree that Sony is being harmed by the sales of Connectix' emulator. Both experts agree that Sony has, and will, lose sales of its PlayStation console. To the extent an individual purchases a VGS to play PlayStation games, those consumers will be less likely to buy PlayStation consoles. Connectix markets its VGS emulator as a substitute for the PlayStation console. To the extent that such a substitution occurs, Sony will lose console sales and profits.

Connectix's expert attempts to rebut this conclusion by focusing on possible benefits to Sony from the VGS. Defendant's expert contends that while Sony may lose console sales, this will have no financial impact on Sony. He explains that VGS will in fact increase profits for Sony because it will increase Sony's revenues from the sale of games and the licensing of game software. However, the arguments presented by Connectix' expert are not supported by *evidence* that Sony does not make substantial profits from its console sales.

## VII.

The court concludes that Sony has shown a high probability of success on its copyright infringement claim. And Sony has shown sufficient evidence of irreparable injury.

## VIII.

Defendant raises two other defenses, which merit only brief discussion.

Connectix raises copyright misuse as a defense. However, at the present time, defendant has not presented a sufficient record on which this court could make any decision in defendant's favor.

Connectix also argues that its use of the Sony BIOS is protected under Section 117(a)(1) of the Copyright Act. Section 117 allows the lawful owner of a copy of a computer program to copy or adapt the program if the new copy or adaptation "is created as an essential step in the utilization of the computer program in conjunction with a machine and ... is used in no other manner." 17 U.S.C. § 117(a)(1). Connectix contends that it "legitimately downloaded the Sony BIOS from a PlayStation it had purchased as an essential step in using the Sony BIOS with a personal computer."

Connectix's argument is not the law in this Circuit. In *Sega*, 977 F.2d at 1520, the Ninth Circuit rejected the use of Section 117 to excuse intermediate copying by disassembly. The court stated that "Section 117 does not purport to protect a user who disassembles object code, converts it from assembly into source code, and makes printouts and photocopies of the refined source code version." *Id.*

## IX.

Sony also contends that it is likely to prevail on its trademark dilution claim, because Connectix admits that PlayStation

games do not run as well on the VGS as they do on a Sony PlayStation. 15 U.S.C. § 1125.

The Federal Trademark Dilution Act provides that

The owner of a famous mark shall be entitled … to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.

15 U.S.C. § 1125(c)(1).

In order to prove a violation of Section 1125(c), Sony must show that (1) its mark is famous; (2) Connectix is making a commercial use of the mark in commerce, (3) Connectix' use began after the mark became famous; and (4) Connectix' use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services. 15 U.S.C. § 1125(c)(1).

Connectix concedes that Sony's "PlayStation" and "Sony Computer Entertainment" trademarks are famous and distinctive, and that defendant's use began after these marks became famous. Thus, the court only addresses the second and fourth factors.

■ The evidentiary record demonstrates that Connectix is making commercial use of the PlayStation mark in commerce. Connectix markets the VGS as a PlayStation emulator—an almost perfect substitute for the Sony PlayStation console. The front of the box in which VGS is packaged uses the PlayStation logo. It states "Play many popular PlayStation games on your Mac." Further, the primary business objective of Connectix is to sell the VGS, which allows consumers to play PlayStation games on their computers. VGS sells on the basis of the popularity and value of Sony's PlayStation mark.

Dilution is defined as the "lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127.

■ In authorizing courts to enjoin dilution, Congress intended "to protect famous marks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it." H.R.Rep. No 374, 104th Cong., 1st Sess. 3 (1995), *Toys "R" Us Inc. v. Akkaoui,* 1996 WL 772709, 1996 U.S.Dist. LEXIS 17090, *7, 40 U.S.P.Q.2d 1836 (N.D.Cal.1996). "Blurring" occurs when a defendant uses a plaintiff's trademark to identify the defendant's goods or services, creating the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product. *Panavision International, L.P. v. Toeppen,* 141 F.3d 1316, 1326 fn. 7 (9th Cir.1998) *citing Ringling Bros. Barnum & Bailey, Combined Shows, Inc. v. B.E. Windows, Corp.,* 937 F.Supp. 204, 209 (S.D.N.Y.1996). "Tarnishment" occurs when a famous mark is improperly associated with an inferior or offensive product or service. *Id.*

Sony argues that its "PlayStation" mark is being tarnished because some PlayStation games do not function as well on VGS as they do on a PlayStation console. Sony has presented evidence that some games run slower, skip screens, have less control responsiveness, and have poorer graphics and sound. Sony argues that even though the VGS contains disclaimers about the playability of PlayStation games, consumers are confused about the source of their unsatisfactory game playing experience using the VGS. It is this confusion which is allegedly tarnishing the high quality reputation of the "PlayStation" mark.

In its defense, Connectix argues that Sony's dilution claim is rebutted by the "overwhelmingly positive reviews" of VGS by actual game players. As evidence, Connectix has submitted various documents, most of which have been downloaded from the Internet. Sony has objected

to this evidence because the "positive reviews" are from anonymous, Internet postings and constitute hearsay. Sony's objection is well taken. Connectix' evidence consists of various, unidentified Internet reports on the VGS. Some of the reports do not have an identified author. Other reports do not address the issues raised in the motion and thus have limited relevance.

There is one document which defendant submitted but which is detrimental to defendant's position. It is the printout from the "macinsearch" web-page. While the document is not identified or authenticated, it appears to consist of reviews from VGS consumers who have played various PlayStation games on their VGS. Some of these reviews are positive in nature. However, the majority of the reviews indicate a dissatisfaction with the game playing on VGS. What is even more relevant about these negative reviews is that they indicate that the game players are associating the poor performance with the PlayStation game, and not with the VGS. For example, a game player reviewing the FIFA '98 "PlayStation" game stated "this *game* work but the *game* skipped frames which made it difficult to play. I would rate this *game* marginally playable." Another game player reviewing the same game stated "the *game* plays like a pig, really slow and jerky with grainy, stuttering, unintelligible audio." As for NHL '98, the reviewer stated "this *game* worked but the *game* skipped frames which made it difficult to play. I would rate this *game* marginally playable." As for NHL '99, the reviewer stated "the *game* freezes whenever a goal is scored." (In all cases, the emphasis is added).

While Connectix admits that poor performance of a PlayStation game is due to the VGS and not to the game, it is evident from the reviews that game players do not comprehend this distinction. These reviews, coupled with Sony's surveys, demonstrate that the inferior quality of game performance with the VGS is tarnishing the PlayStation high-quality game trademark.

Connectix also argues that the "minor problems" allegedly encountered by running PlayStation games on VGS, even if true, do not rise to the level necessary for a claim of trademark dilution. Connectix contends that an unlawful tarnishment requires a showing that the trademark was used in an "unwholesome or degrading context." *E.g. Minnesota Mining and Manufacturing Co. v. Rauh Rubber, Inc.,* 943 F.Supp. 1117, 1132 (D.Minn.1996) *aff'd* 130 F.3d 1305 (8th Cir.1997).

However, the case law in the Ninth Circuit holds that "tarnishment occurs when a famous mark is *linked to products of poor quality* or is portrayed in an unwholesome manner." *See Panavision Int'l L.P. v. Toeppen,* 945 F.Supp. 1296, 1304 (C.D.Cal. 1996) *aff'd Panavision Int'l L.P. v. Toeppen,* 141 F.3d 1316, 1325 (9th Cir.1998) (emphasis added). The record before the court demonstrates that consumers are associating Sony's "PlayStation" mark with the VGS, and are getting inferior results. Sony has established a likelihood that Connectix' VGS dilutes its PlayStation trademark. And irreparable injury is presumed.

### X.

Since Sony has made a strong showing as to its copyright and trademark claims, and of irreparable injury, the court need not discuss Sony's claim of defendant's alleged circumvention of Sony's technological protection measures.

### XI.

The remaining issue is the scope of the preliminary injunction to be issued.

Sony seeks to enjoin the sale of VGS, both for Macintosh and Windows, based on Connectix' intermediate infringement. Sony argues that it is irrelevant that the final product does not actually *contain* any Sony BIOS, that an injunction on the sale of VGS is proper in light of the

policies underlying the Copyright Act, and that if an injunction does not issue Connectix will escape the consequences of its infringing conduct.

In response, Connectix argues that the court has no authority to enjoin its sale of VGS because the product admittedly does not *contain* any copied code. Defendant cites *Kepner–Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533 (5th Cir. 1994). However, that case is distinguishable in light of Ninth Circuit law. The Ninth Circuit has held that

> ... intermediate copying of computer object code *may infringe* the exclusive rights granted to the copyright owner in section 106 of the Copyright Act *regardless of whether the end product of the copying also infringers those rights.*

*Sega*, 977 F.2d at 1519 (emphasis added). That case does not speak directly to the issue of the appropriate remedy, but it does focus on the nature of the wrong.

While it is undisputed that VGS does *not* contain any copyrighted material, in a copyright infringement claim based on intermediate infringement, the composition of the end product is not the sole test. The infringing conduct is based on *how* the end product was developed. Here, the evidence is clear that Connectix unlawfully copied and used Sony's BIOS to develop its VGS. Thus, the only effective remedy for such intermediate infringement is to enjoin the end product. If not, an intermediate infringer could always avoid the consequences of illegal copying and use by editing the protected code out of its final product.

While such a broad injunction could have a serious effect on defendant's business, the Ninth Circuit has recognized that a defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." *Triad Systems Corp.*, 64 F.3d at 1338.

Therefore, this court believes that it has the authority to enjoin, and should enjoin, the retail sale of VGS under *Sega*, 977 F.2d at 1519.

Connectix is therefore enjoined and restrained, pending the trial of this action: (1) From making copies of or using Sony's BIOS, or derivative works based upon or incorporating Sony's BIOS, as a step in developing VGS for Windows. (2) From selling or distributing VGS for either Macintosh or Windows-based computer systems. (3) Connectix is ordered to deliver to the court, in the care of the Clerk of the Court, all copies of Sony's BIOS and all copies of derivative works based upon or incorporating Sony's BIOS. (4) This order shall bind the parties, their officers, agents, servants, employees, bind the parties, their officers, agents, servants, employees, and attorneys, and all those who would act in concert with them after receiving actual notice of this order. Fed. R.Civ.P. 65(d).

Finally, Rule 65(c) requires plaintiff to post a security "in such sum as the court deems proper." Fed.R.Civ.P 65(c). This generally means an amount sufficient to cover defendant's incidental and consequential costs arising from the injunction. Neither party has addressed the issue of a bond amount in this preliminary injunction motion. Sony was required to post a bond in the amount of $100,000 in conjunction with the court's order on Sony's second application for a temporary restraining order. However, in light of the scope of the court's present order, the court will consider raising the amount of bond on motion by defendant.

A status conference will be held on May 7, 1999, at 11:00 a.m., to consider the scheduling of further proceedings in the case.

IT IS SO ORDERED.